# United States District Court

## Western District of Wisconsin

Katie McGlenn on behalf of her minor daughter,

Lauren Engle, Margaret McGlenn,

Kylie Kavanaugh, Lillian Xistris, Adeline Xistris,

Sydney Marz, Annie Parenteau, Jeff Haupt on behalf

of his minor daughter, and Alayna Tucker,

      Plaintiffs,

                   Case No.  21-683

   v.

Madison Metropolitan School District, and

David Kruchten, in his individual capacity,

      Defendants.

# FIRST AMENDED COMPLAINT

## I.    NATURE OF ACTION

101.   Plaintiffs bring this civil action under 42 USC § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution in order to obtain damages, including punitive damages, and any appropriate declaratory

judgment, together with their reasonable attorney's fees and costs, for the injuries arising from Defendants' surreptitious video supervision of their unclothed bodies in private places such as bathrooms.

## II.    JURISDICTION AND VENUE

### A.    Jurisdiction.

201.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (42 U.S.C. § 1983 jurisdiction).

### B.    Venue

202.    The Western District is the proper venue for this action because the Plaintiff's claims substantially arose within the geographical boundaries of the Western District of Wisconsin within the meaning of U.S.C. § 1391(b).

## III.   PARTIES

### A.    Plaintiffs

301.    The Plaintiff, Lauren Engle is an adult resident of the State of Wisconsin with the capacity to sue and be sued in this Court. Ms. Engle was a high school student attending East High School in the Madison Metropolitan School District from 2016 to 2020.

302. The Plaintiff, Margaret McGlenn is an adult resident of the State of Wisconsin with the capacity to sue and be sued in this Court. Ms. McGlenn was a high school student attending East High School in the Madison Metropolitan School District from 2014 to 2018.

303. The Plaintiff, Katie McGlenn, is an adult resident of the State of Wisconsin with the capacity to sue and be sued on behalf of her minor daughter in this Court. Katie McGlenn is the guardian of her minor daughter who was a high school student attending East High School in the Madison Metropolitan School District from 2019 to the present, and expects to graduate with the class of 2023.

304. The Plaintiff, Kylie Kavanaugh, is an adult resident of the State of Wisconsin with the capacity to sue and be sued in this Court. Ms. Kavanaugh was a high school student attending East High School in the Madison Metropolitan School District from 2016-2020.

305. The Plaintiff, Lillian Xistris, is an adult resident of the State of Wisconsin with the capacity to sue and be sued in this Court. Ms. Xistris was a high school student attending East High School in the Madison Metropolitan School District from 2015-2019.

306. The Plaintiff, Adeline Xistris, is an adult resident of the State of Wisconsin with the capacity to sue and be sued in this Court. Ms. Xistris was a high

school student attending East High School in the Madison Metropolitan School District from 2017-2021.

307.  The Plaintiff, Sydney Marz, is an adult resident of the State of Wisconsin with the capacity to sue and be sued in this Court.  Ms. Marz was a high school student attending East High School in the Madison Metropolitan School District from 2016-2020.

308.    The Plaintiff, Annie Parenteau, is an adult resident of the State of Wisconsin with the capacity to sue and be sued in this Court.  Ms. Parenteau was a high school student attending East High School in the Madison Metropolitan School District from 2017-2021.

309.    The Plaintiff, Jeff Haupt, is an adult resident of the State of Wisconsin with the capacity to sue and be sued on behalf of his minor daughter in this Court. Mr. Haupt is the guardian of his minor daughter who was a high school student attending East High School in the Madison Metropolitan School District from 2019 to the present, and expects to graduate with the class of 2022.

310.    The Plaintiff, Alayna Tucker, is an adult resident of the State of Wisconsin with the capacity to sue and be sued in this Court.  Ms. Tucker was a high school student attending East High School in the Madison Metropolitan School District from 2017-2021.

B.     **Defendants**

311.    Defendant Madison Metropolitan School District is a municipal agency and unit of local government with the capacity to sue and be sued in this Court, and receives federal funding as a public educational institution.

312.    Defendant David Kruchten is an adult resident of the State of Wisconsin.  At all times pertinent, Defendant Kruchten was employed as a teacher for the Madison Metropolitan School District, and was acting within the scope of his employment and under the color of law.  Defendant Kruchten is sued in his individual capacity.

IV.    **ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION**

401.    The Madison Metropolitan School District (the "Madison School District") has had a pattern and practice of installing and using hidden cameras, housed in hollowed-out smoke detectors or other similar inconspicuous housing devices, to supervise and surreptitiously record its employees and students.

402.    According to a police report attributing statements to Madison School District Director of Labor Relations, Attorney Heidi Tepp, secret surveillance cameras have been used at East High in the "past ten years."

403.    The Madison School District's pattern and practice included approval of placing these hidden cameras in areas where people had a reasonable expectation of

privacy, such as where East High School students were likely to expose their unclothed bodies.

404.     For example, from approximately September 6, 2019, through September 30, 2019, the Madison School District's pattern and practice permitted and condoned the use of secret cameras, hidden in inconspicuous devices, such as a hollowed-out smoke detector, in two places within East High School: (a) Room 127, a room used for working with students with disabilities, where the camera was situated and aimed in a way that would capture video recordings of disabled students in various states of undress, such as having their clothing changed, while on the cot used for such purposes; and (b) inside the coaches' office, which was in the locker room, where it could be reasonably expected that people would be getting out of and into their clothing.

405.     In an email, dated January 13, 2021, from the Madison School District Director of Safety and Security Mark Brown, to a Madison police officer, Brown reported that the cameras were "in areas that individuals may have been undressing," and that "the impacted individuals are not only adults, but possibly students and individuals from outside of the East HS circle."

406.     The Madison School District Director of Labor Relations, Attorney Heidi Tepp; former Head of Security, Joe Balles; Assistant Director of Operations, Dave Kapp; and Director of Building Services, Jo Anderson, with the knowledge of the Madison School District in-house legal counsel, approved of and condoned the use of

these surreptitious video monitoring and recordings by employees of East High School as a method of supervision, and in the fall of 2019, hidden cameras at East High were officially approved by Attorney Tepp, with feed access being given to the latter three men.

407.     The placement of these two hidden cameras in these particular spaces was incongruent to any demonstrated necessity, and the invasion of privacy they inflicted was wholly disproportionate to the school's claimed goal of trying to catch a janitorial employee sleeping on the job, after having allegedly caught that employee sleeping on the job once before in a location outside the building.

408.     David Kapp, the Madison School District Assistant Director of Operations told Madison police that in 2019, the then Madison School District Facilities Manager Jo Anderson (now retired) found a custodial employee sleeping in his car during his 10 p.m. to 6 a.m. shift, and so they received permission to place hidden cameras to try to catch him sleeping in the locker room area or the disability student room area of East High School.

409.     According to police reports, the secret cameras did not actually catch this employee sleeping on the job, and this investigation ceased approximately three weeks after it began.

410.     Even after the Madison School District ceased investigating the allegedly sleeping employee in the fall of 2019, they left the secret cameras in place so that it would be easy to use them again in the future.

7

411.    The secret cameras were wired in such a way that anyone with the IP address and the password could view the live feed.

412.    The Madison School District in-house electrician, who was tasked with installing the hidden cameras in the fall of 2019, later told Madison police that even after they stopped recording, "they were still in place and wired so there was a live feed but they were not recording.  [The electrician] said in order to view the live video you would have to know the IP address and the password."

413.    The Madison School District wholly failed to institute any policies designed to protect the privacy of the students or the students' bodily integrity, such as educating students to check for such devices before undressing, or advising the students or parents that students were being visually recorded or monitored in bathroom and locker room areas, so that they could take their own precautionary measures.

414.    Any reasonable high school administrator or teacher would have known that it was unreasonable and unconscionable to secretly surveil or live stream students via hidden cameras in areas where students had a reasonable expectation of privacy or would be undressing, such as bathrooms or locker rooms.

415.    As stated by Board of Education member Nicki Vander Meulen, "There's no reason ever for hidden cameras in our schools."  (October 25, 2021, Board Meeting.)

416.    These Madison School District higher-ups knew their use of secret cameras in these particular private areas was abhorrent.

417.    For example, Mr. Balles, one of the three men with access to the visual feeds from the secret video cameras placed in September of 2019, told the *Isthmus* that he was "never consulted" regarding the hidden cameras that had been installed in the fall of 2019, and that he first learned of the hidden surveillance equipment in 2021.

418.    However, in an email dated September 6, 2019, with the subject designated as "BOE Policy on Cameras," from Jo Anderson to Joe Balles, Heidi Tepp, David Kapp, and others, Anderson stated:

> Only with prior approval can a camera that does not look like a camera be deployed.  We have two going up at East next weekend.  Their video will be placed on the BS DVR, which has limited access to Jo, Joe, Dave, and the electric shop...

419.    Moreover, while, on information and belief, former East High School principal Mike Hernandez was aware of this practice and condoned it, when Hernandez took a job in the District's central administration in the fall of 2019 and Brendan Kearney became interim principal, Mr. Balles, Ms. Tepp, and others did not disclose the existence of these cameras to Kearney.

420.    Hence, when Kearney became aware, in early 2021, of the hollowed-out smoke detector used to house a camera in the locker room area at East High School that had been originally placed in the fall of 2019, he informed the Madison Police Department.

421.    On January 21, 2021, Mike Brown, the Madison School District Director of

Safety and Security who had been trained by, and took over for, Joe Balles, emailed a

Madison Police Detective to say:

> Officers took a report today regarding some hidden cameras, or remnants
> thereof, that were found in the coaches office out at East HS.  Due to recent
> incidents involving hidden cameras that staff had placed (Minneapolis) it would
> be best if Det's contact me directly, instead of Brendan Kearney (Principal) for
> follow-up.  In this situation the cameras were authorized to be placed by our HR
> staff regarding an employee issue, but there are some extenuating circumstances
> that may need to be addressed (internally).

422.    The "staff" who had placed hidden cameras in Minneapolis that Mr.

Brown was referring to was David Kruchten.

423.    The Madison School District employed Kruchten as a business education

and marketing teacher since approximately 2008, as well as a tennis coach and DECA

store manager.

424.    Part of Kruchten's duties were to mentor, monitor, and supervise children

who were members of the East High School chapter of the DECA, Inc., (formerly

Distributive Education Clubs of America), a 501(c)(3) not-for-profit career and technical

student organization with more than 225,000 members internationally, on fieldtrips

and overnight extended trips to DECA events and competitions.

425.  The DECA curriculum-enriching program focuses on students developing

leadership skills and experience by participating in competitive events in marketing,

business management and administration, finance, and hospitality/tourism; and East

High School had a DECA chapter, led by Defendant Kruchten as East High School's

DECA Local Advisor, consisting of student participants who were some of East High School's brightest students.

426.    The Madison School District policy required, for extended trips, that a minimum of one district employee must supervise the trip, and that there be a minimum ratio of one adult chaperone to every ten students.

427.    Moreover, Mr. Kruchten, as DECA Coordinator and Local Advisor, was instructed: a) to be responsible for room checks to ensure that students were in their rooms during curfew hours; b) to know the whereabout of his students "at all times;" c) that he should refrain from "leaving students unsupervised," and d) that he was "responsible for their delegates' conduct [and] shall be available to students at all times."

428.    However, other than these broad and vague directives, District policy did not spell out procedures for supervising the children, apparently leaving this almost, if not entirely, to the discretion of the district employees supervising the trip.

429.    Defendant Kruchten used his discretion to supervise some of the students he was chaperoning on extended DECA trips, in part, by installing surreptitious surveillance cameras, hidden in inconspicuous housing devices, such as hollowed-out smoke detectors, in the students' hotel rooms, including in their hotel bathrooms, where they would be regularly expected to be in various states of undress.

430.    Defendant Kruchten admitted to employing this practice for approximately the past seven years, starting in or around 2014.

11

431. Mr. Kruchten would generally accomplish this on DECA trips by obtaining from the hotel front desk and holding in his possession a key for each student's hotel room, then entering their rooms early on in the trip, when they were not present, to install the cameras, and finally removing them near the end of the trip.

432. Kruchten used his broad discretion and authority given to him by the Madison School District regarding the supervision of the children on these trips to routinely collect all the hotel keys for all of his students' rooms, keeping one key for each room in his possession for the duration of the trip, and handing out the other copies of the keys to the students who would be staying in the rooms.

433. Kruchten used his broad discretion to place "do not disturb" signs on his students' hotel rooms, to minimize the opportunities of hotel housekeeping staff to interfere with his secret recording devices.

434. Kruchten's discretion was so broad that he was able to target certain students, which he considered his "DECA Elite," for example, by, in the October, 2019, Emerging Leader's DECA trip to Wisconsin Dells, directing that they not stay in the regular hotel rooms like the other students, but instead in a Presidential Suite that he paid for separately; by inducing at least one student to attend by asking at the last minute for her to come without the payment that was required by all other students, despite her family having the ability to pay; and by, on multiple trips holding a "DECA after dark" event, where Kruchten would stay up until the wee hours of the morning hanging out with his "DECA elite" minor students in their hotel rooms.

12

435.    Kruchten only selected female students for the "upgraded" suites on DECA trips, never the male students.

436.    In the face of the supervisory directives and broad discretion given to Kruchten as to how to accomplish those directives, the Madison School District did not provide adequate supervision or oversight to ensure he was using his discretion lawfully.

437.    The Madison School District gave Kruchten such vast discretion and authority that either co-chaperones did not question or report behaviors such as placing a select group of female students in Presidential Suites instead of the regular DECA rooms and hanging out with children in their hotel rooms into the wee hours of the morning, or the co-chaperones did report such oddities and the District simply responded with indifference.

438.    In utilizing the surreptitious recording devices in Plaintiffs' hotel rooms on school trips, Mr. Kruchten was actuated in part by a desire to serve his employer, the Madison School District, specifically by meeting the requirements of his duties as a teacher chaperone to supervise and monitor the children.

439.    Mr. Kruchten later stated in court that he had placed the cameras to see what the children were doing in their private spaces.

440.    Mr. Kruchten admitted that he had placed the cameras there, in part, to make sure the children were not doing things like drinking alcohol.

13

441.    The placement of the hidden surveillance cameras in the students' hotel bathrooms was not justified at its inception, as there was no reasonable suspicion of misbehavior on the part of the children.

442.    For example, the children were warned that their luggage would be searched by security personnel, and that the search would be documented prior to departure on any trip, so it was already assured before departure that the children did not have contraband in their possession.  At the time, the Madison School District security department was led by Joe Balles, a former Madison Police Department Captain.

443.    The placement of hidden surveillance cameras in the students' hotel bathrooms was not reasonably related in scope to any potential for misbehavior, because secretly recording children in their private hotel bathrooms is excessively intrusive, and alternative and much less intrusive measures of supervision were available – such as those used by DECA coordinators and lead advisors of every other one of the many high schools represented at DECA events.

444.    The Plaintiffs developed information and belief that they were being illegally recorded with surreptitious video cameras during the DECA trip to an event at the Hyatt Hotel, in, Minneapolis, Minnesota, from December 6 through 8, 2019.

445.    During that field trip, two Madison School District employees, David Kruchten and Joe Fanning, both East High teachers, were responsible for the supervision and welfare of the East High students on the trip, including Plaintiffs.

14

446.    On the last evening of that trip, East High students found the secret camera recording devices in their hotel bathrooms, and through discussions with other students on the trip, realized that only the rooms occupied by all East students contained these monitoring devices.

447.    For example, some of the rooms contained a mix of East and West high school students, and those devices were not found in any of the rooms where West high students were staying.

448.    The children also noticed that the camera housing devices, such as hollowed-out smoke detectors and air fresheners, were found in all three rooms that contained all East students.

449.    Panicked at the realization that they had been surreptitiously viewed or recorded in their hotel bathrooms completing activities like showering and going to the bathroom, the Plaintiffs turned these devices over to Mr. Fanning, informing him that the devices had been in their bath and shower areas in their hotel rooms and that they were quite distressed.

450.    Mr. Fanning did not notify the Plaintiffs' parents.

451.    Mr. Fanning did not notify any emergency contact at the District.

452.    Mr. Fanning did not notify hotel security.

453.    Mr. Fanning did not make a report to police.

454.    Mr. Fanning simply returned the devices to Mr. Kruchten.

15

455.    Mr. Kruchten turned over some, but not all, of the devices to the hotel, falsely reporting that they must have been left by the prior occupants of the room, in an attempt to appease the worried students.

456.    Both Mr. Kruchten and Mr. Fanning were mandatory reporters[1] of potential sexual exploitation of a child under Wisconsin law, by way of their employment as teachers, and by way of school policy.

457.    However, neither Fanning nor Kruchten notified police, a decision which was later condoned by the Madison School District upon administrative review, as the District held that mandated reporting was not required in this instance because, the Madison School District concluded, what Mr. Kruchten did in secretly recording the children in their hotel rooms did not technically constitute child abuse or exploitation.

458.    Specifically, in this regard, the Madison School District investigation concluded that "there was no sexual abuse or exploitation warranting a report," under Wisconsin's mandatory reporting laws, while also stating, in apparent contradiction, that "common sense should dictate that, given the placement of the devices, they could have been used to record nude images of students; and that those actions may be criminal, such that a report to the District administration, police and parents/guardians should immediately have been made."

---

[1] Wisconsin law (Sec. 48.981(2) Wis. Stats.) requires that any mandated reporter, such as a school teacher, who has reasonable cause to suspect that a child seen by the person in the course of his or her professional duties has been abused or neglected, make a report to county CPS or law enforcement.

459.     Because, by the morning of December 8, 2019, no reports had been made, other than by the students to Fanning and Kruchten, and by the students to their parents, the students and parents became concerned as to why police had not arrived yet and as to what would happen if they were to depart on the bus bound for Madison the next morning without a police report having been filed with the local police.

460.     Therefore, in the early morning of December 8, 2019, at least one parent took it upon herself to call the Hyatt Regency and speak directly with an employee there, and some parents and hotel staff also called the local Minneapolis police, on behalf of the students.

461.     Moreover, a helpful Hyatt Regency employee also reviewed and disclosed to police the hotel room key card activity, which pointed to either Kruchten or Fanning as having placed the cameras, as it showed that an advisor tried multiple keys belonging to other students' rooms before gaining entry, at times when the students were known to be out of their rooms.

462.     The local Minneapolis police arrived and spoke to both Mr. Kruchten and Mr. Fanning, who denied any wrongdoing, moments before the two teachers and all of the students embarked on the bus trip back to Madison.

463.     In the meantime, the parents of some of the Plaintiffs called officials at the District to inform them that they believed Mr. Kruchten was responsible for the unreasonable monitoring of children through the use of surreptitious recording devices, and they begged the administration to put Mr. Kruchten and Mr. Fanning on

17

leave, so that they would not have access to their children, pending investigation, including the Minneapolis police investigation that came to focus on Mr. Kruchten as the primary suspect.

464.    The fact that Kruchten and Fanning did not themselves notify the District leaders of this trip-emergency prior to parents reaching out to the District the next day, would, in and of itself, have led a reasonable school administrator to place these teachers on leave pending investigation.

465.    Upon returning to Madison, Mr. Kruchten attended a private telephonic meeting with Joe Balles, Mike Brown, and Principal Kearney, at approximately 6 p.m. on Sunday, December 8, 2019.

466.    The District unreasonably allowed Mr. Kruchten further access to the children he had exploited, and allowed Mr. Kruchten further access to his workspaces where he could alter or destroy evidence.

467.    The Plaintiffs – as children - banded together to review all of their photos and videos from past DECA trips, and saw that on the prior trips, the same types of housing devices, such as air fresheners and smoke detectors, appeared in their hotel bathrooms, which led them to determine that Mr. Kruchten, the common denominator, was responsible for placing them.

468.    On Monday, December 9, 2019, there was no school, but, on information and belief, Mr. Kruchten was allowed unsupervised access to the East High School building.

469.   On Tuesday, December 10, 2019, Mr. Kruchten was allowed to carry out his regular duties, and this gave him additional access to all of his work computers, classrooms, and storage areas to destroy or manipulate evidence, as well as the students he had victimized.

470.   Finally, after multiple protests by families and students throughout the day, Mr. Kruchten was placed on paid leave that afternoon.

471.   On or around December 12, 2019, at 2:30 p.m., State of Wisconsin Department of Justice Division of Criminal Investigation (DOJ-DCI) Special Agent Crowe, who was investigating crimes related to the secret cameras that had been placed by Defendant Kruchten, conducted a search at East High School for the purpose, in part, of looking for surreptitious recording devices or any other evidence that would be relevant to Kruchten's unlawful acts.

472.   Joe Balles was the Madison School District employee who "assisted" Special Agent Crowe during the law enforcement search of school grounds.

473.   As alleged above, Balles knew of the surreptitious recording devices, and their hollowed-out smoke detector hiding devices, in the disability room and the locker room areas of East High School.

474.   Those hidden cameras, that had been placed in September of 2019, as alleged above, were not removed until July 2020, and the camera housing devices were still in place at least as late as early January of 2021.

475.     Those hidden cameras and housing devices which were strikingly similar to those used by Kruchten in Minneapolis, and would have likely been of interest to investigators, were not located on the law enforcement search of East High School that was conducted with the assistance of Balles.

476.     Balles did have a conversation with Special Agent Crowe during the search to confirm that the Probable Cause documents would be sealed, meaning that the public would not have access to them.

477.     Injured families demanded that the Madison School District conduct a review of its policies and procedures that allowed Mr. Kruchten to place secret recording devices in their children's hotel rooms, including in the bathrooms.

478.     The Madison School District spent the next several months attempting to cover up its wrongdoing, and stonewalling the injured families.

479.     By late 2020, even the Madison School Board of Education was fed up with the Madison School District Administration's apparent ongoing attempts at secrecy.  On September 3, 2020, the Board Representative to East High School, Christina Gomez Schmidt, forwarded to the Madison School District Administration emails from families asking for details about what investigation was taking place if any, into how the Madison School District could have allowed this to happen, why Kruchten had not been fired, and other relevant questions that any injured family would want to know.

480.     Board Member Gomez Schmidt informed Mr. Hertting that, "some repair work may need to be done with these parents and students who feel they have not been kept up to date after this traumatic experience."

481.     The Madison School District Interim Assistant Superintendent for Staff & Operations, Michael Hertting, wrote Gomez Schmidt back on September 4, 2020, stating:

> I strongly suggest that you do not respond to parents about this personnel matter.  Doing so will likely bring additional questions that you are not able to answer.  We are briefing Carlton and Richard soon to determine next steps.  There could be further litigation and responding could place you in a vulnerable position legally.  I appreciate the desire to respond to the parents, as well as the concern for our students.

482.     On information and belief, Madison School District employee Heidi Tepp, the employee who, as alleged above, approved the Madison School District's secret camera installations, was chosen to lead, and define the limits of, an investigation as to what had occurred during the Minnesota trip, including defining the scope of the review and making the determination as to what information would be kept hidden from impacted families.

483.     In 2020, the Madison School District hired an attorney to conduct the review, in an initial effort to shield the review from victims, students, parents, and community members, by claiming that the product of the administrative review was attorney-client privileged and protected work-product.

21

484.     The Madison School District's "investigation," was conducted by attorney Malina Piontek, who has a history of defending the district alongside Tepp, and the District paid approximately $8,000 to that attorney for the "investigation."

485.     This "investigation" was a sham, in that it specifically excluded parents of victims and the victims themselves who wanted to be interviewed and share their information, as the District was intentionally turning a blind eye for fear of what they might see.

486.     This "investigation," once completed, was not released to families and victims (though many months later, for reasons currently unknown, the Madison School District, after repeatedly denying access to injured families, released it to the press).

487.     The "findings" of the "investigation" were summarized for disclosure to injured families and the public by Ms. Tepp, in the fall of 2020.

488.     This "investigation" made reference to Kruchten's "inappropriate behavior," but ultimately concluded that there were no identifiable violations of District policy on the Minnesota trip.

489.     The "investigation" concluded that there was no failure on the part of District staff to follow the Madison School District field trip policy or its policy on reporting child abuse.

490.     Mr. Kruchten was not disciplined or terminated by the Madison School District, despite having signed paperwork asserting that he was "aware that each adult

chaperone must follow all district staff rules and regulations during the extent of the trip…I agree to report any infractions within 24 hours to the school site or district administrator… I am aware that if I violate any of the rules and regulations that I may be subject to disciplinary actions."

491.    Nor was Mr. Fanning disciplined or terminated for his failure to report or his failure to protect students.

492.    The Madison School District's investigation did note the extremely broad discretion the District had given to Kruchten, including discretion and ability to define and diminish the role of other adult chaperones on the trip, and to obtain and keep a room key to each student's hotel room, despite there being no legitimate reason to do so, given that in an emergency hotel staff, law enforcement, or even another co-rooming student could make emergency entry possible.

493.    In sum, the Madison School District's investigation, found no wrongdoing on behalf of the District, and the only wrongdoing it found on behalf of Kruchten was that he had violated the Madison School District Social Media and Digital Communication Guidelines for Staff by using his personal cell phone to communicate with students and families while on field trips.

494.    Similarly, the Madison School District engaged a private law firm, MWH Law Group, for a fee of $30,000, to conduct an investigation into its pattern and practice of using surreptitious recording devices, such as those in September of 2019, as alleged above, likely so that the District could again attempt to claim attorney-client

privilege to keep the results of the investigation from injured families, which it could not claim if it had conducted the investigation itself.

495.    The Madison School District's practice of using hidden cameras for surveillance in private spaces, coupled with instructing Kruchten through extremely vague mandates to supervise his students on these extended trips at all times, giving Kruchten extremely broad authority and discretion as to how to accomplish this supervision, and the Madison School District's complete lack of any mitigating steps such as adequate supervision of Kruchten or teaching the students to look for and be aware of hidden cameras, like the ones the Madison School District was using at East High School, prior to disrobing, caused Mr. Kruchten to subject the Plaintiffs to repeated surreptitious monitoring and recording of their unclothed bodies on multiple occasions spanning many years.

496.    On information and belief, Defendant Kruchten subjected Kylie Kavanaugh to this unconscionable practice at minimum on the following dates and in the following locations: November 6, 2016, in Wisconsin Dells at the Wilderness hotel; March 6-9, 2017, in Lake Geneva at the Geneva Grand Resort; April 24-29, 2017, in Anaheim California at the Hyatt; November 12-13, 2017, in Wisconsin Dells at the Kalahari; March 4-6, 2018, in Lake Geneva at the Geneva Grand Resort; and October 29-30, 2018, in Wisconsin Dells, at the Kalahari Resort.

497.    On information and belief, Defendant Kruchten subjected Adeline Xistris to this unconscionable practice at minimum on the following dates and in the following

locations: November 12-13, 2017, in Wisconsin Dells at the Kalahari; October 29-30, 2018, in Wisconsin Dells, at the Kalahari Resort; March 3-6, 2019, in Lake Geneva at the Geneva Grand Resort; April 25-May 1, 2019, in Orlando Florida; and December 6-8, 2019, in Minnesota, Minnesota, at the Hyatt Regency.

498.    On information and belief, Defendant Kruchten subjected Lillian Xistris to this unconscionable practice at minimum on the following dates and in the following locations:  March 2016, in Lake Geneva; April 2016, in Nashville, TN; March 6-9, 2017, in Lake Geneva at the Geneva Grand Resort; April 24-29, 2017, in Anaheim California at the Hyatt; December 2017, in Chicago, IL; March 4-6, 2018, in Lake Geneva at the Geneva Grand Resort; November 15-19, 2018, in Chicago, IL; March 3-6, 2019, in Lake Geneva at the Geneva Grand Resort; and April 25-May 1, 2019, in Orlando, FL.

499.    On information and belief, Defendant Kruchten subjected Sydney Marz to this unconscionable practice at minimum on the following dates and in the following locations:  March 6-9, 2017, in Lake Geneva at the Geneva Grand Resort; April 24-29, 2017, in Anaheim California at the Hyatt; November 12-13, 2017, in Wisconsin Dells at the Kalahari Resort; March 4-9, 2018, in Lake Geneva at the Geneva Grand Resort; March 3-6, 2019, in Lake Geneva at the Geneva Grand Resort; and April 25-May 1, 2019, in Orlando, FL.

500.    On information and belief, Defendant Kruchten subjected Katie McGlenn's minor daughter to this unconscionable practice on the following dates and

in the following locations:  October 27-28, 2019, in Wisconsin Dells, at the Kalahari Resort.

501.    On information and belief, Defendant Kruchten subjected Lauren Engle to this unconscionable practice at minimum on the following dates and in the following locations:  November 6, 2016, in Wisconsin Dells at the Wilderness hotel; November 12-13, 2017, in Wisconsin Dells at the Kalahari; October 29-30, 2018, in Wisconsin Dells, at the Kalahari Resort; and March 3-6, 2019, in Lake Geneva at the Geneva Grand Resort.

502.    On information and belief, Defendant Kruchten subjected Jeff Haupt's minor daughter to this unconscionable practice at minimum on the following dates and in the following locations:  October 29-30, 2018, in Wisconsin Dells, at the Kalahari Resort; and December 6-8, 2019, in Minneapolis, Minnesota, at the Hyatt.

503.    On information and belief, Defendant Kruchten subjected Annie Parenteau to this unconscionable practice at minimum on the following dates and in the following locations: November 16-18, 2018 in Chicago, IL; and December 6-8, 2019, in Minneapolis, Minnesota, at the Hyatt.

504.    On information and belief, Defendant Kruchten subjected Margaret McGlenn to this unconscionable practice at minimum on the following dates and in the following locations:  March 8-10, 2016 in Lake Geneva; April 24-28, 2016, in Nashville, TN; March 6-9, 2017, in Lake Geneva at the Geneva Grand Resort; April 24-29, 2017, in Anaheim California at the Hyatt; March 4-9, 2018, in Lake Geneva at the Geneva Grand Resort.

505.    On information and belief, Defendant Kruchten subjected Alayna Tucker to this unconscionable practice at minimum on the following dates and in the following locations: October 27-28, 2019, in Wisconsin Dells, at the Kalahari Resort.

506.    The Madison School District recognized in its administrative review that the secret monitoring and recording of students "has been traumatic" and "continues to deeply affect our students."

507.    Yet, as alleged above, the District has spent thousands of dollars for private attorneys to conduct administrative reviews that have been shielded from the injured parties, and has not meaningfully attempted to redress the injuries to the students.

508.    All of the Plaintiffs have suffered trauma, at varying levels; many were not emotionally able to return to school for a long period of time; many were and are emotionally unable to take classes that they needed but which are still, to this date, taught by Mr. Fanning, and many still have trauma responses that negatively affect their ability to learn and participate in their education and other life activities.

V.    **VIOLATIONS OF LAW**

A.    **Unreasonable Search: Fourth Amendment**

509.    Defendant Kruchten, acting under color of law, unreasonably placed hidden surveillance cameras in spaces where Plaintiffs had every reasonable expectation of privacy, such as the Plaintiffs' private hotel bathrooms during field

27

trips, for the purpose of surveilling, monitoring, and supervising the Plaintiffs, despite there being no substantial interest that would outweigh the privacy interest of the students, in violation of the Plaintiffs' Fourth Amendment rights.

510.    Defendant Madison School District had an actual pattern and practice of using hidden surveillance cameras as a method of supervision, in places where students, including the Plaintiffs, had a reasonable expectation of privacy, and in the absence of any substantial interest that would outweigh the privacy interests of the students in their unclothed bodies, and in so doing facilitated Defendant Kruchten's surreptitious surveillance of these Plaintiffs, and further refused to terminate him and acted to cover up and otherwise ratify his conduct, in violation of the Plaintiffs' Fourth Amendment rights.

## B.    Substantive Due Process: Fourteenth Amendment

511.    The Plaintiffs had a significant privacy interest in their unclothed bodies and a high expectation of privacy and bodily integrity in their hotel bathrooms, they were not warned that they could potentially be monitored or videotaped while in these private spaces despite being warned about other methods of monitoring they would be subjected to, such as a search of their luggage upon departure for overnight field trips and regular check-ins with adult chaperones, and yet they were surveilled by Defendant Kruchten through the use

of secret and hidden video cameras in a manner that would capture their unclothed bodies, in violation of their right to privacy guaranteed by the Due Process Clause of the Fourteenth Amendment.

512.    Defendant Kruchten's exercise of his power as a governmental employee, mentor, chaperone, and teacher, to the end of secretly videotaping students in their private spaces where they were reasonably expected to be exposing their genitals is so egregious, outrageous, and offensive to our fundamental democratic notions of fair play, ordered liberty, and human decency, that it shocks the conscience, in violation of the Due Process Clause of the Fourteenth Amendment.

513.    The Defendant Madison School District created an unreasonable risk of danger and exposed the Plaintiffs to foreseeable and obvious harm by adopting a secret surveillance policy that was deliberately indifferent to the constitutional right of students to bodily integrity thereby encouraging a climate to flourish where innocent children would be and were victimized, failing to take steps to mitigate that obvious and foreseeable harm, and affirmatively covering up and ratifying such conduct, including by misleading investigators, downplaying the allegations, and refusing to terminate Kruchten.

C.     **Equal Protection Clause: Fourteenth Amendment**

514.    Defendant Kruchten specifically targeted the female Plaintiffs in part on the basis of their sex for invasive secret surveillance that would give him access to images of their unclothed bodies and viewing of their genitals in violation of their rights under the Equal Protection Clause of the Fourteenth Amendment.

**E.    Municipal Liability: Indemnification**

515.    Defendant the Madison School District is responsible to defend this action and to satisfy any judgment entered against the individual defendants pursuant to Wis. Stat. § 895.46, regardless of whether the wrongful acts alleged herein were carried out pursuant to a custom or policy of the Madison School District.

**VI.    RELIEF**

**A.    DAMAGES**

**1.    Compensatory Damages**

601.    By virtue of the unlawful actions alleged above, Plaintiffs sustained economic losses and expenditures, medical expenses, pain and suffering, public humiliation and embarrassment, loss of educational opportunities, and other damages for which each of them should be compensated in an amount deemed just by the Court.

2.      Punitive Damages

602.    Because the acts of the individual defendant herein alleged were carried

out maliciously or with reckless disregard for the Plaintiffs' fundamental rights, the

Plaintiffs seek an award of punitive damages against the individual defendant to deter

him and others similarly situated from similar wrongful acts in the future.

## VII.   CONDITIONS PRECEDENT

701.    All conditions precedent to this action, within the meaning of Rule 9(c),

Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII.   DEMAND FOR JURY TRIAL

801.    The Plaintiffs hereby demands a trial by jury of all issues triable of right to

a jury.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant judgment against the

Defendants, awarding the Plaintiff:

901.    Monetary damages in amounts that will fairly compensate the plaintiffs

for their injuries;

902.    Punitive damages in amounts that will justly punish the defendants for

their actions;

904. The costs, attorneys' fees and litigation expenses as well as any further relief this Court deems just.

Dated this Wednesday, November 10, 2021.

Respectfully submitted,

Katie McGlenn on behalf of her minor daughter,

Lauren Engle, Margaret McGlenn,

Kylie Kavanaugh, Lillian Xistris, Adeline Xistris,

Sydney Marz, Annie Parenteau, Jeff Haupt on behalf of his minor daughter, and Alayna Tucker,

Plaintiffs,

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.

JEFF SCOTT OLSON
State Bar No. 1016284
ANDREA J. FARRELL
State Bar No. 1064773
131 W. Wilson St., Suite 1200
Madison, WI 53703
Phone:        (608) 283-6001
Facsimile:    (608) 283-0945
E-mail:       jsolson@scofflaw.com
              ajf@scofflaw.com


/s/ Andrea J. Farrell

_____

ANDREA J. FARRELL