IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TESS MCGLENN, MARGARET MCGLENN,
LAUREN ENGLE, KYLIE KAVANAUGH,
LILLIAN XISTRIS, ADELINE XISTRIS,
SYDNEY MARZ, ANNIE PARENTEAU,
GABRIELLE HAUPT, and ALAYNA TUCKER,

                    Plaintiffs,

         v.

MADISON METROPOLITAN SCHOOL DISTRICT,          OPINION and ORDER
DAVID KRUCHTEN, HEIDI TEPP, JOE FANNING,
and JOE BALLES d/b/a/ JP Public Safety Consulting,          21-cv-683-jdp
LLC,

                    Defendants,

         and

AUTO-OWNERS INSURANCE COMPANY
and COMMUNITY INSURANCE CORPORATION,

                    Intervenor-Defendants.

---

David Kruchten was a teacher for the Madison Metropolitan School District for more than ten years. For most of that time, Kruchten was also a chaperone for the district on out-of-town student-field trips requiring overnight stays at hotels. Kruchten was well liked by the students—and their parents too. But what the students and parents didn't know was that Kruchten was placing hidden cameras in students' hotel rooms—including their bathrooms—and he was recording their most private moments so that he could view them after the trip. According to Kruchten, he had a longstanding obsession with knowing what others were doing when he was not around, and the students were just some of his many victims, which ranged from his babysitter to his godparents. Kruchten continued the secret recordings of students for

four years, until one group of students finally discovered cameras in their rooms, leading to his arrest and conviction in this court for attempting to make child pornography.

Plaintiffs were all Madison East High School students who attended overnight field trips chaperoned by Kruchten. They are also all victims of his secret recordings. In this lawsuit, plaintiffs contend that Kruchten violated their rights under both the U.S. Constitution and state law. But Kruchten is not the only one plaintiffs blame for what happened to them. They also contend that the school district, Kruchten's co-chaperone, the district's human resources director, and a security consultant violated plaintiffs' constitutional rights by failing to prevent what Kruchten did.

This opinion addresses six pending motions: (1) plaintiffs' motion for summary judgment on the issue whether Kruchten's conduct violated the Fourth Amendment and the Due Process Clause, Dkt. 146; (2) a motion filed by all the defendants except Kruchten seeking summary judgment on all claims, Dkt. 156; (3) plaintiffs' motion for sanctions based on discovery misconduct, Dkt. 198; (4) the district's motion to strike plaintiffs' motion for sanctions, Dkt. 303; (5) plaintiffs' motion to exclude training materials produced by the district, Dkt. 138; and (6) plaintiffs' motion under Federal Rule of Civil Procedure 43 to allow plaintiff Lilian Xistris to testify at trial by video conference, Dkt. 278. The court will address the two summary judgment motions on insurance issues in a separate opinion.

The court will grant plaintiffs' summary judgment motion on the issue whether Kruchten violated the Fourth Amendment. Kruchten's surreptitious recordings were a severe invasion of privacy and an obvious violation of the Fourth Amendment. No party disputes this. Instead, the district says that Kruchten cannot be sued under federal law because he wasn't acting "under color of law," a requirement that applies to all constitutional claims. But

Kruchten exploited his authority as a chaperone for the district to violate plaintiffs' rights, so that requirement is met. Plaintiffs cannot meet the elements for their other federal claims against Kruchten, so the court will dismiss those.

As for the claims against the other defendants, plaintiffs do not offer evidence that any school district policies authorized what Kruchten did or that defendants knew any more than the students themselves about his misconduct. Instead, plaintiffs point to numerous gaps in district policies, procedures, and training regarding both proper supervision of students and preventing and detecting sexual abuse by district employees. Plaintiffs believe that defendants could have prevented what Kruchten did if they had filled these gaps.

Plaintiffs make some good points. The district imposed few rules on chaperones, and it provided almost no guidance to either students or staff on detecting the warning signs for sexual abuse. The district provides no excuse for taking such a lax attitude on keeping students safe from potential predators. So if the question were whether the district and its employees could have done more to prevent sexual misconduct or even whether the district was negligent, plaintiffs would have a strong claim.

But that is not the question. To prevail on a constitutional claim against the district, plaintiffs must show that the district was on notice that conduct like Kruchten's would be an obvious consequence of failing to enact or implement new policies or procedures. Similarly, plaintiffs must show that the individual defendants knew of a strong likelihood that Kruchten or someone in his position would secretly record students on field trips. These are demanding standards, and plaintiffs cannot satisfy them. Plaintiffs point to no other similar conduct by chaperones or teachers that would have raised red flags. Nor do they point to evidence that any of the defendants knew anything about Kruchten suggesting that he would do something

like this. Most of plaintiffs' proposed changes to district policy are targeted at different problems, such as sexual assault and grooming. Regardless of how deficient the district's policies and procedures were, plaintiffs simply have not shown a direct causal connection between those deficiencies and Kruchten's conduct, which is what the law requires.

The district and the other individual defendants are entitled to summary judgment. This is not because they did an exemplary job to protect students. Rather, the court must grant summary judgment to those defendants because the Supreme Court has held time and again that negligence is not enough to sustain a constitutional claim against either municipal entities like the district or public employees. Even drawing all reasonable inferences in plaintiffs' favor, no reasonable jury could find from the evidence submitted by plaintiffs that it should have been obvious to the district or other defendants that Kruchten's constitutional violations were highly likely.

That leaves several other motions: plaintiffs' motions for sanctions, defendants' corresponding motion to strike portions of the sanctions motion, plaintiffs' motion to exclude evidence, and plaintiffs' motion to allow Lillian Xistris to testify at trial by video conference. As for the sanctions motion, plaintiffs have not shown that the district committed perjury or other misconduct that warrants entering default judgment, which is the only remedy that plaintiffs seek. So the court will deny that motion. The court will also deny defendants' motion to strike.

As for the motion to exclude, it relates to some of the district's training materials. The court did not rely on those materials in deciding the motions for summary judgment, and the materials have no relevance to the remaining claims against Kruchten. So that motion is denied as moot, and the court will not discuss it further.

4

As for the motion to allow Xistris to testify remotely, only the district opposed that motion. But the district is being dismissed in this opinion, so it will not be appearing at trial. This means that the motion is essentially unopposed, so the court will grant it. Plaintiffs' counsel should contact the clerk's office to make arrangements.

BACKGROUND

Collectively, the parties submitted well over 1,000 proposed findings of fact. More than 700 of those were from plaintiffs. Unfortunately, the parties did not submit proposed findings in a way that was helpful to the court. For example, no party provided a straightforward chronology of events. Instead, each side organized their submissions around argumentative points. There was widespread redundancy among the parties' facts, and the parties did not even discuss most of their proposed facts in their briefs. No party provided a coherent, well-organized narrative.

Striking the parties' proposed findings of fact would not be efficient at this late stage of the case. But the court has disregarded proposed findings of fact that were not discussed in a brief, unless it was otherwise clear why the fact was relevant. "The purpose of the statement of proposed findings of fact is to clearly identify the material facts and to allow the court to determine whether those facts are genuinely in dispute." Motions for Summary Judgment I.B.1, attached to Dkt. 21. That purpose is not served by proposed findings of fact that are redundant, extraneous, argumentative, or poorly organized.

The factual summary that follows provides some basic background to understand the context of plaintiffs' claims. The court will discuss more facts as they become relevant to the analysis.

Plaintiffs were high school students at Madison East High School in the Madison Metropolitan School District at some point between 2016 and 2019. All were members of Distributive Education Clubs of America, or DECA, a student club involved in competitive events related to business and marketing. Many DECA events were out of town and required overnight stays at hotels.

Kruchten was a teacher and coach for the district at East High School. He also served as an advisor for East High School's DECA chapter from 2008 or 2009 to 2019. In his capacity as advisor, Kruchten accompanied students and chaperoned them on overnight trips. Fanning was also a teacher for the district and a DECA advisor. He accompanied Kruchten on some DECA field trips beginning in 2017.

In 2016, Kruchten began placing hidden cameras in students' hotel rooms during overnight field trips. He placed cameras in the rooms of both male and female students. He would accomplish this by telling his co-chaperone to wait in the hotel lobby with the students while Kruchten checked in and got room keys. While the others were still in the lobby, Kruchten would enter the student's rooms to place the cameras. Kruchten placed the cameras in the hotel bathrooms, and he would point the cameras toward areas like the shower and the toilet, so they would capture nude images of the students.

At the end of the trip, Kruchten would retrieve the cameras after the students had vacated the rooms. The cameras did not provide live images but instead saved the recording to a memory card. Kruchten would view the recordings of both male and female students after he returned home.

The plaintiffs attended at least one and as many as ten overnight DECA events while Kruchten was chaperoning. Kruchten recorded each of the plaintiffs in their hotel rooms at least once.[1]

In December 2019, Kruchten and Fanning accompanied East High School students, including some plaintiffs, to a DECA competition in Minneapolis, Minnesota. At some point during the trip, a group of male and female students came to Kruchten and Fanning's hotel room. They handed Fanning what looked like air fresheners, and they told him they found the objects in one of the student's rooms. When Fanning opened it up, he saw wires and something that looked like a USB wireless mouse receiver.

Kruchten had been in the shower when the students came to the door. When he came out of the bathroom, he took the devices from Fanning and said that he would take care of it. The parties do not clearly explain the chronology of events after this, but at some point the next day, some students became concerned and called their parents. The parents, in turn, called the police. Defendant Joe Balles, a security consultant for the district, also called the police when the incident was later reported to him.

Two days after Kruchten and the students returned to Madison, the district placed Kruchten on administrative leave based on suspicion that he was responsible for the hidden cameras. He was arrested in January 2020, and he resigned in February 2020. In 2021, he pleaded guilty in this court to traveling interstate to make child pornography and attempting

---

[1] Plaintiffs rely on Kruchten's admission in his answer for this fact. Dkt. 50, ¶ 458. The district says that it is not bound by that admission, Dkt. 252, ¶ 37; Dkt. 261, ¶ 482, but it cites no contrary evidence, only statements from plaintiffs that they are not personally aware of being recorded. Those statements do not contradict Kruchten's admission, so the court will treat this fact as undisputed.

to produce sexually explicit and obscene images of minors. He was sentenced to 144 months in prison, to be followed by 20 years of supervised release.

ANALYSIS

Plaintiffs assert the following claims in their second amended complaint:

1) Kruchten secretly recorded plaintiffs in their hotel rooms, in violation of the Fourth Amendment, the Due Process Clause, the Equal Protection Clause, and Wisconsin's privacy statute (Wis. Stat. § 995.50).

2) The school district must pay any judgment against Kruchten, in accordance with Wis. Stat. § 895.46.

3) Fanning failed to intervene to stop the recordings, in violation of the Fourth Amendment, the Equal Protection Clause, and the Due Process Clause.

4) Tepp and Balles failed to prevent Kruchten's misconduct, in violation of the Equal Protection Clause and the Due Process Clause.

5) The school district had policies and practices that led to Kruchten's misconduct, in violation of the Fourth Amendment, the Equal Protection Clause, and the Due Process Clause.

Plaintiffs move for partial summary judgment on the issues whether Kruchten's conduct violated the Fourth Amendment and the Due Process Clause. All defendants except Kruchten move for summary judgment on all claims against them. In this opinion, the court will refer to those defendants collectively as "the district" unless otherwise specified. No party moved for summary judgment on the state-law privacy claim, which is asserted against Kruchten only.

On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

8

*Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

The claims against Kruchten serve as the foundation for the claims against all the other defendants, so the court will consider the claims against Kruchten first, followed by the claims against the other individual defendants, and finally the claims against the school district.

## A. Kruchten

Plaintiffs assert claims against Kruchten under the Fourth Amendment, the Due Process Clause, and the Equal Protection Clause. Plaintiffs also contend that Kruchten invaded their privacy, in violation of Wis. Stat. § 995.50.

The claims against Kruchten are before the court in a somewhat unusual procedural posture. Kruchten did not file his own motion for summary judgment. Plaintiffs do not move for summary judgment on any entire claim, but only on the issues whether secretly recording students in the manner that Kruchten did violates the Fourth Amendment and the Due Process Clause. But plaintiffs acknowledge that there is a threshold question on those claims, which is whether Kruchten was acting "under color" of state law. That is a prerequisite to all claims brought under 42 U.S.C. § 1983, as plaintiffs' constitutional claims are. Neither Kruchten nor plaintiffs move for summary judgment on the question whether Kruchten acted under color of law. But the district does move for summary judgment on the issue, based on its view it cannot be held liable under § 1983 unless Kruchten was acting under color of law. The other parties make the same assumption, so the court will as well. This means that the court must first consider defendants' argument that Kruchten did not act under color of law before considering whether Kruchten or any of the other defendants violated plaintiffs' constitutional rights. For the reasons explained below, the court concludes that Kruchten did act under color of law.

As for the merits of the claims against Kruchten, both sides also assume that the other defendants did not violate plaintiffs' rights unless Kruchten violated their rights. Again, Kruchten did not move for summary judgment on any of plaintiffs' claims. But the other defendants contend that Kruchten did not violate the Due Process Clause or the Equal Protection Clause. So the court will consider whether plaintiffs are entitled to summary judgment on the issue whether Kruchten's conduct violated the Fourth Amendment and the Due Process Clause and whether defendants are entitled to summary judgment on the claims under the Due Process Clause and the Equal Protection Clause. For the reasons explained below, the court will grant plaintiffs' motion on the Fourth Amendment claim and grant the district's motion on the other claims. No party moves for summary judgment on the invasion-of-privacy claim under state law, but that claim appears to overlap substantially with the Fourth Amendment claim. So the court will direct the parties to show cause why the court should not grant summary judgment to plaintiffs on that claim.

The district also moves for summary judgment on the question whether Kruchten was acting with the scope of his employment. The court will grant that part of the district's summary judgment motion as well.

### 1. Color of law

Section 1983 authorizes lawsuits for constitutional violations that occur "under color" of law. The district contends that Kruchten was not acting under color of law when he recorded the students. The court disagrees.

"Action is taken under color of state law when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Barnes v. City of Centralia, Illinois*, 943 F.3d 826, 831 (7th Cir. 2019)

(internal quotations omitted). That is what happened in this case. Kruchten had authority over plaintiffs and access to their rooms only because he was a district employee assigned to chaperone the students on school-related trips. The undisputed facts show that Kruchten's actions involved the abuse of authority that the district had given him. "[I]t is firmly established that a § 1983 defendant acts under color of state law when he abuses the position given to him by the State." *DiDonato v. Panatera*, 24 F.4th 1156, 1159–60 (7th Cir. 2022) (internal quotation marks omitted).

The district contends that Kruchten was not acting under color of law because "the nature of his job" did not include "surreptitiously recording students while they were naked in their bathrooms and/or other personal areas so that days later he could watch those videos in the privacy of his home to satisfy his deviant curiosity and perversions." Dkt. 165, at 79. In other words, the district's position appears to be that Kruchten was not acting under color of law because his job duties did not require him to secretly record students.

Defendants' argument is based on an overly narrow reading of the law. The district cites no Supreme Court or Seventh Circuit cases holding or implying that a public employee cannot act under color of law if his conduct is unauthorized or if he is motivated by personal interests. Even if a defendant "overstepped the bounds of his state-granted authority," he still acts under color of law when he is "cloaked with official power" and uses that power to violate the plaintiff's rights. *DiDonato*, 24 F.4th at 1160. Motive or intent is relevant to determining scope of employment for indemnification purposes, *Martin v. Milwaukee County*, 904 F.3d 544, 552–53 (7th Cir. 2018), but it is not an element of acting under color of law. In *Walker v. Taylorville Correctional Center*, 129 F.3d 410, 413 (7th Cir. 1997), the court rejected the view that the

defendant was not acting under color of state law simply because she was "pursu[ing] her own interests."

If motive or scope of employment were dispositive, sexual misconduct could almost never meet the "color of law" requirement. But the court of appeals has held otherwise. For example, in *Doe v. Smith*, 470 F.3d 331, 340 (7th Cir. 2006), the court upheld a jury's finding that sexual abuse of a public-school student by the school's dean of students occurred under color of law—even though some of the abuse occurred at the dean's home—because the dean used his official authority to gain custody and control over the student. In *Wudtke v. Davel*, 128 F.3d 1057, 1064 (7th Cir. 1997), the court concluded that a public-school teacher had adequately alleged that the school superintendent's sexual abuse was under color of law because he used his state position to coerce her into sex. And in *Walker,* the court concluded that a prisoner adequately alleged that a state counselor's sexual abuse was under color of law because the defendant "had access to [the prisoner] in his cell and in the shower area as a result of her official position." In none of those cases did the court consider the defendant's intent or whether the sexual abuse was related to the defendant's job duties. The key question was whether the defendants used the authority granted to them by the state to commit the abuse.

The district does not meaningfully distinguish *Doe* and *Wudtke*. (Both sides ignore *Walker*.) As for *Doe*, the district says, "[t]here is nothing in *Doe's* color of law analysis that is noteworthy." Dkt. 256, at 8. But that is exactly the point. *Doe* applied well-established principles to conclude that sexual misconduct can occur under color of law. Those same principles support the conclusion that Kruchten also acted under color of law. As for *Wudtke,* the district points out that the court's color-of-law discussion was "a single paragraph," and the district states without explanation that *Wudtke* "does nothing to inform whether Kruchten

12

acted under color of state law in secretly recording students while they were naked." Dkt. 256, at 8. The length of the court's discussion does not make *Wudtke* any less binding on this court. If anything, the court's brevity suggests that its conclusion was sufficiently obvious to render more discussion unnecessary. The district is correct that secret video recordings and physical assaults are not the same thing, but that is beside the point. It does not matter what the specific misconduct it is. Again, what matters is whether the defendant used his government job to commit the misconduct.

The district's reliance on *Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509 (7th Cir. 2007), is misplaced. In that case, a reporter had a heart attack and died after being confronted at her home by the sheriff, who was using intimidation to prevent her from covering alleged misconduct by the sheriff. The court concluded that the sheriff was not acting under color of law. But the sheriff was not acting in his official capacity when he went to the reporter's home, and his threats were unrelated to his job. *Id.* at 512–13. The court also emphasized that there was no evidence that the sheriff used his position to gain entry to the reporter's house. *Id.* at 516. Like the defendants in *Doe, Wudtke*, and *Walker*, and unlike the defendant in *Sims*, Kruchten used the authority he had from his government job to commit misconduct while he was on the job. So he acted under color of law within the meaning of § 1983.

As already noted, plaintiffs did not move for summary judgment on the color-of-law element. But, as the district points out, Dkt. 165, at 14, the court can decide the issue as a matter of law when no facts are in dispute. *See Olejnik v. England*, 147 F. Supp. 3d 763, 771 (W.D. Wis. 2015). Neither side identifies any relevant factual disputes. The court may grant summary judgment to a nonmoving party on the court's own motion so long as the losing party is on notice that it should come forward with all of its evidence. *Celotex Corp. v. Catrett*, 477

U.S. 317, 326 (1986). In this case, the district's position is that the court can decide the issue as a matter of law. No party identifies any additional facts that might be relevant to the issue, and the court cannot conceive of any additional facts that could make a difference. So there would be no point to presenting the issue to a jury, and the court will grant summary judgment to plaintiffs on this issue.

### 2. Fourth Amendment

Only plaintiffs move for summary judgment on the question whether Kruchten violated the Fourth Amendment. Among other things, the Fourth Amendment prohibits unreasonable searches. U.S. Const amend. IV. The amendment's protections are not limited to criminal investigations or other investigations of wrongdoing. *Hess v. Garcia*, 72 F.4th 753, 759–60 (7th Cir. 2023). Rather, "[t]he Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government, without regard to whether the government actor is investigating crime or performing another function." *Id.* (internal quotation marks omitted).

Plaintiffs cite *New Jersey v. T.L.O*, which sets forth a two-part test for assessing the validity of a search in the school setting: (1) was the decision to search the student reasonable? and (2) was the search reasonably related in scope to the circumstances that justified the interference in the first place? 469 U.S. 325, 341–42 (1985). Plaintiffs also cite *Brannum v. Overton County School Board*, in which the Court of Appeals for the Sixth Circuit concluded that video surveillance of students undressing in a locker room is a search under the Fourth Amendment, that the school's interest in safety and security did not justify the search, and that it was clearly established that the Fourth Amendment prohibits videotaping students while changing their clothes. 516 F.3d 489, 499 (6th Cir. 2008). Under this case law, plaintiffs say,

14

Kruchten violated plaintiffs' clearly established Fourth Amendment rights by videorecording them in their hotel rooms.

None of the defendants challenge plaintiffs' arguments under the Fourth Amendment, and that was a wise decision. Even without Supreme Court or Seventh Circuit precedent directly on point, this is a situation in which a "constitutional rule already identified . . . appl[ies] with obvious clarity to the specific conduct in question." *Michael C. v. Gresbach*, 526 F.3d 1008, 1017 (7th Cir. 2008). The constitutional violation was obvious: video recording a minor in a private setting in various states of undress and without the minor's knowledge is a severe intrusion of privacy, and Kruchten had no justification for that intrusion. So Kruchten violated plaintiffs' clearly established rights under the Fourth Amendment, and the court will grant summary judgment to plaintiffs against Kruchten on this issue. Because the court has also decided the threshold color-of-law question in plaintiffs' favor, plaintiffs are entitled to summary judgment on their Fourth Amendment claim against Kruchten.

### 3. Substantive due process

Plaintiffs contend that Kruchten's conduct also violated their substantive due process rights under the Fourteenth Amendment. A defendant infringes the right to substantive due process when he deprives someone of a "fundamental right or liberty," the defendant's conduct is "arbitrary and irrational," and the conduct "shocks the conscience." *Nelson v. City of Chicago*, 992 F.3d 599, 604 (7th Cir. 2021).

Plaintiffs say that the fundamental right at issue is the "right to bodily integrity," but all the cases they cite involve a physical invasion, such as a sexual assault or nonconsensual touching. *See Hess*, 72 F.4th at 765–67 (nonconsensual, sexual touching, and groping); *Tyson v. Sabine*, 42 F.4th 508, 518 (5th Cir. 2022) (officer forced plaintiff to strip and masturbate).

15

Plaintiffs cite no cases that have extended the right to video surveillance. That makes sense because the right to bodily integrity is about interference with a person's *liberty* within the meaning of the Due Process Clause. Video surveillance can be a severe invasion of privacy, but it does not restrict a person's freedom of movement or other liberty. In fact, that is the point of a hidden camera: to secretly view someone while he or she acts freely.

In any event, "plaintiffs should resort to the substantive guarantees of the Due Process Clause for relief only when there is not a particular Amendment that provides an explicit textual source of constitutional protection against a particular sort of government behavior." *Childress v. Walker*, 787 F.3d 433, 438–39 (7th Cir. 2015) (internal quotation marks omitted). In this case, the court has already determined that Kruchten's conduct was a search that violated the Fourth Amendment, so it would be inappropriate to apply the Due Process clause as well.

It is true that the court in *Hess* allowed the plaintiff to proceed on both a Fourth Amendment and substantive due process claim. 72 F.4th at 764–65. But that was because the case was at the pleading stage, so it was not yet clear what the facts were and whether the plaintiff could ultimately prove a Fourth Amendment claim. *Id.* In this case, the court is granting summary judgment to plaintiffs on their Fourth Amendment claim against Kruchten, so *Hess*'s reasoning does not apply. The court will grant summary judgment to all defendants on plaintiffs' substantive due process claim.

### 4. Equal protection

Plaintiffs' complaint includes a claim under the Equal Protection Clause, alleging that Kruchten targeted plaintiffs because they were girls. The district moves for summary judgment on this claim on the ground that Kruchten installed cameras in the hotel rooms of both boys and girls, and he viewed recordings of both boys and girls. Plaintiffs neither dispute the

evidence that the district cites, *see* Dkt. 257, ¶¶ 101, 152, nor offer a substantive response to the district's argument. Instead, plaintiffs say that they "do not see the need to respond to the Equal Protection argument raised by" the district because plaintiffs believe that they will prevail on their other claims. Dkt. 241, at 33.

Arguments not refuted are forfeited. *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016). And even if plaintiffs did not forfeit the claim, they have failed to cite evidence that Kruchten discriminated against them on the basis of sex. So the court will grant summary judgment to defendants on the equal protection claim.

### 5. State-law claim

Plaintiffs are also asserting a claim for a violation of their right to privacy under Wis. Stat. § 995.50. Among other things, that statute prohibits "[i]ntrusion upon the privacy of another of a nature highly offensive to a reasonable person, in a place that a reasonable person would consider private, or in a manner that is actionable for trespass." *Id.* § 995.50(2)(am)1.

No party moves for summary judgment on this claim, but it is not clear why. The privacy interests protected by § 995.50 are similar to those protected by the Fourth Amendment, and courts have evaluated the claims together. *See, e.g., Wisconsin State Senate v. City of Green Bay*, – F. Supp. 3d –, No. 23-cv-1175, 2024 WL 808953, at *5 (E.D. Wis. Feb. 27, 2024). It seems clear that Kruchten's conduct was "highly offensive to a reasonable person" and intruded into "a place that a reasonable person would consider private." Making surreptitious videos of a minor in her hotel bathroom readily satisfies the state-law standard.

 There is no point in holding a trial on liability for the state-law claim when that issue can be decided as a matter of law, especially when the court has already decided liability on the Fourth Amendment claim as a matter of law. It could be confusing for the jury to

understand why it is considering damages for both claims, but liability for only one. So the court will direct the parties to show cause why summary judgment should not be granted to plaintiffs on the issue whether Kruchten violated § 995.50. *See Celotex*, 477 U.S. at 326 ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence").

### 6.  Scope of employment

The last issue relevant to the claims against Kruchten is not about the merits of a claim, but rather about who is responsible for paying a judgment awarded against Kruchten. Under Wis. Stat. § 895.46, the district must pay the judgment on any claim against an employee for "acts committed while carrying out duties as an . . . employee."

The Wisconsin Supreme Court has described the § 895.46 standard in different ways, as discussed in *Martin v. Milwaukee County*, 904 F.3d 544, 552–53 (7th Cir. 2018). The court of appeals synthesized the various descriptions as follows:

> An act is *not* in the scope unless it is a natural, not disconnected and not extraordinary, part or incident of the services contemplated. An act is *not* in the scope if it is different in kind from that authorized, far beyond the authorized time or space, or too little actuated by a purpose to serve the employer. But an act *is* in the scope if it is so closely connected with the employment objectives, and so fairly and reasonably incidental to them, that it may be regarded as a method, even if improper, of carrying out the employment objectives. We must consider the employee's intent and purpose, in light of subjective and objective circumstances.

*Id.* at 555. Relevant to this case, the court also noted that the standard for scope of employment under § 895.46 is narrower than the standard for acting under color of law, *id.* at 552, so this court's ruling regarding color of law is not dispositive on scope of employment.

Neither side cites case law involving application of § 895.46 under similar facts.[2] The district compares this case to those involving different forms of sexual misconduct. The courts in those cases have uniformly held that sexual misconduct falls outside the scope of employment.[3] Plaintiffs say that sexual assault is not a fair comparison because sexual assault will never be part of an employee's duties, but Kruchten's conduct should be viewed as "completely unreasonable supervision," and "supervision was his primary duty on these trips."

---

[2] In its own research, the court uncovered *Gallun v. Soccer U.S.A., Inc.*, 1994 WL 133053, at *3 (Wis. Ct. App. 1994), in which the court held that a "maintenance and security employee" who secretly videotaped an athlete in the locker room was not acting within the scope of his employment because "[s]urreptitiously videotaping [the athlete] was not something [the employee] had been employed to do, and such conduct, according to the record, was not actuated in any way to serve his employer's purposes." Regardless of whether *Gallun* is instructive, it is not precedential, and Wisconsin Rules of Appellate Procedure prohibit courts from relying on nonprecedential decisions issued before 2009. Wis. Stat. § 809.23(3).

[3] *See, e.g.*, *Martin*, 904 F.3d at 556 (employee's sexual assaults were "in no way actuated by a purpose to serve County. He raped Martin for purely personal reasons, the rapes did not benefit County but harmed it, he knew the rapes did not serve County, and the rapes were outside the scope"); *Noeldner v. Taylor Cnty.*, No. 21-cv-244-wmc, 2022 WL 4365858, at *12 (W.D. Wis. 2022) ("Cheever's sexual abuse of an inmate plainly fell outside the scope of her employment because her actions could not reasonably be viewed as a means of serving any government objective, but rather as a means of serving her own personal interests."); *S.V. v. Kratz*, 2012 WL 5833185, at *4 (E.D. Wis. 2012) (prosecutor not acting within scope of employment by sending sexual text messages to victim, reasoning that "there is no spectrum of acceptable behavior" when "an employee engages in sexual misconduct"); *B.A. v. Bohlmann*, 2011 WL 13359272, at *8 (W.D. Wis. 2011) (doctor's sexual touching of patient not within scope of employment); *Doe v. Foley*, 2020 WI App 60, ¶ 20, 2020 WL 4781582, at *4 (Ct. App. 2020) ("Wisconsin case law has held that sexual conduct falls outside of one's scope of employment."); *Block v. Gomez*, 549 N.W.2d 783, 788, 201 Wis. 2d 795, 807 (Ct. App. 1996) (therapist's sexual relationship with client not within scope of employment); *Olson v. Connerly*, 156 Wis. 2d 488, 496, 457 N.W.2d 479, 482 (1990) (upholding finding that doctor's sexual abuse of patient wasn't within scope of employment); *Desotelle v. Continental Cas. Co.*, 136 Wis. 2d 13, 28, 400 N.W.2d 524 (Ct. App. 1986) (upholding finding that sheriff wasn't acting within scope of employment when he sexually assaulted victim in squad car). Plaintiffs cite *Olson* incorrectly as upholding a jury verdict finding that the doctor acted within the scope of employment. Dkt. 241, at 36 n.6.

Dkt. 241, at 36. Plaintiffs believe that the better comparison is the use of deadly force by police, which can be within the scope of employment even if it is excessive.[4]

The court concludes that Kruchten's conduct is more akin to sexual misconduct than excessive force during an arrest. *Bohlmann* is instructive. In that case, patients alleged that their doctor "sexually touch[ed]" them during genital and rectal examinations. *Bohlmann*, 2011 WL 13359272, at *3. The alleged assaults occurred in the context of providing medical care, but the court concluded that no reasonable jury could find both that the plaintiffs' allegations were true and that that the doctor acted within his scope of employment. *Id.* If the jury found in favor of the plaintiffs, this meant that "the touching had no relationship to a legitimate medical objective, its sole purpose was sexual or other personal gratification and Bohlmann was acting wholly outside the scope of his agency." *Id.*

The same result is required in this case. As in *Bohlmann*, Kruchten's misconduct was carried out while he was on the job. And also like *Bohlmann*—and unlike the cases involving excessive force—Kruchten's conduct was not motivated by a misguided interest to serve his employer, and it did not serve his employer in any way.

Kruchten pleaded guilty to attempting to produce sexually explicit and obscene images of minors, and he admitted during his sentencing hearing and his deposition that sexual arousal was a "factor" in making the secret recordings and that there was a "sexual component" to his conduct. Dkt. 190, at 165:6–13; *U.S. v. Kruchten*, No. 20-cr-10-jdp, Dkt. 134, at 103:5–17. He

---

[4] *See Javier v. City of Milwaukee*, 670 F.3d 823 (7th Cir. 2012); *Graham v. Sauk Prairie Police Commission*, 915 F.2d 1085 (7th Cir. 1990); *Cameron v. City of Milwaukee*, 102 Wis. 2d 448, 307 N.W.2d 164 (1981).

also said that his primary motivation was "curiosity" about what the students were doing, especially during "private" or "intimate" moments. Dkt. 190, at 102:6–19, 107:3–9, 148:22–149:7; 176:12–24; *Kruchten*, No. 20-cr-10-jdp, Dkt. 134, at 103:18–104:6 and Dkt. 94-1, at 7. In fact, his position during sentencing was that "his criminal behavior was driven by voyeurism." *Kruchten*, No. 20-cr-10-jdp, Dkt. 94, at 3. In his sentencing statement, he wrote that he had been spying on family and friends for years because of a "need for adrenaline" and because he "wondered what they were doing when [he] was not around." *Id.* at 7. He referred to his "fixation of spying," the "rush" he got from "having spied," and making "voyeuristic videos" to "see what people did when [he was] not there." *Id.* at 7–11.

In arguing that a reasonable jury could find that Kruchten was acting within the scope of his employment, plaintiffs point to Kruchten's responses to some requests for admission and questions from plaintiffs' counsel during his deposition. Plaintiffs' discovery requests asked Kruchten to admit that he "utilized surreptitious recording device(s) or camera(s) for the purpose of supervising" plaintiffs. Dkt. 148-1. During his deposition, plaintiffs' counsel asked Kruchten a series of leading questions about his reasons for secretly recording the students. Specifically, counsel asked him whether he was: (1) monitoring the students for "dangerous behaviors" like "drug use or vaping" or self-harm; (2) making sure the students were not inviting "third parties" into their rooms; or (3) making sure the students were not still sleeping when they should be getting ready for competitions. Dkt. 190, at 99:4–100:9.

Kruchten's answers to these questions do not raise a genuine issue of material fact about scope of employment. As an initial matter, even in response to plaintiffs' leading questions, Kruchten did not embrace plaintiffs' framing. For example, in response to their request for admission, Kruchten objected to plaintiffs' us of the word "supervising" as

"impermissibly vague." Dkt. 148-1. And in response to plaintiffs' deposition questions, multiple times Kruchten declined to answer "yes," instead stating that his reasons were not as "specific" as what plaintiffs' questions suggested. Dkt. 190, at 99:16–18, 100:7–9.

Kruchten did agree with plaintiffs' counsel during his deposition that he recorded students to "supervise" them, *id.* at 99:25–100:3, and, after raising the objection that the word "supervising" was vague, he nevertheless admitted that he "began" his secret recordings "at least in part for the purpose of supervising students." Dkt. 148-1. There are multiple reasons to question Kruchten's conclusory testimony, including that: (1) Kruchten's cameras did not have a live feed, so he could not use them to monitor students contemporaneously, Dkt. 190 (Kruchten Dep. 157:14–158:11); (2) Kruchten did not say that he ever used the footage to stop a student from engaging in a particular behavior, and he could not have done so without exposing his crimes; (3) Kruchten admitted in his sentencing statement that it was just an "excuse[]" to say that he was recording students to keep them out of trouble; rather, his real reasons for the recordings were "the adrenaline" and "the obsessive urge to know what everyone is doing all the time," *Kruchten*, No. 20-cr-10-jdp, Dkt. 94-1, at 9.

The general rule is that a court may not make credibility determinations on a motion for summary judgment, *Gupta v. Melloh*, 19 F.4th 990, 996–97 (7th Cir. 2021), but there is a narrow exception to that rule: "testimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it." *Seshadri v. Kasraian*, 130 F.3d 798, 801–02 (7th Cir. 1997). There is a strong argument that Kruchten's conclusory testimony that he secretly recorded students to "supervise" them meets the above standard. The testimony is implausible on its face, it is inconsistent with Kruchten's other statements, and it is inconsistent with all the other evidence in the case about why Kruchten did what he did.

22

But even if the court accepts Kruchten's testimony as true, it does not create a genuine issue of material fact. The question for scope of employment is not simply whether Kruchten was trying to "supervise" students, but whether the Kruchten was "actuated by a purpose to serve the" district, and whether his conduct was "part or incident of the services contemplated." *Martin*, 904 F.3d at 555. No reasonable jury could find that Kruchten's conduct meets that test. Secretly recording students in their hotel rooms was not just a wildly inappropriate attempt by Kruchten to perform his job; it bore no relation to any basic understanding of what supervision means. Kruchten's own testimony demonstrates that he knew this even while he was violating plaintiffs' rights. He admits that he knew that placing cameras in the students' rooms was wrong and illegal, that he did not tell anyone at the district about what he was doing because he did not want them to know, and that he knew that the district would not approve of what he was doing, which is why he was afraid when students found the cameras. Dkt. 190 (Kruchten Dep. 155:17–156:23, 170:23–171:6); Dkt. 257, ¶¶ 154; Dkt. 280, ¶¶ 49–52. So both objectively and subjectively, Kruchten was not serving the interests of the school district. Even if he was trying to "supervise" the students, the undisputed facts show that he conducted that "supervision" for purely personal reasons.

Plaintiffs say in their brief that the district admits that it "benefited for [a] number of years from the way Kruchten was conducting supervision on the trips." Dkt. 241, at 38. But the testimony plaintiffs cite has nothing to do with Kruchten's hidden cameras. Rather, plaintiffs cite testimony from East High's principal that he was not aware that any students were physically harmed or got into trouble while on a field trip with Kruchten. Dkt. 188 (Kearney Dep. 227:17–229:3). That testimony does not support a finding that Kruchten was acting within the scope of his employment when spying on students in their hotel rooms.

Plaintiffs are correct that scope of employment is generally a fact question for the jury. But like any other fact question, "it is proper to decide the scope of employment issue on a motion for summary judgment so long as the underlying facts are not in dispute and reasonable inferences leading to conflicting results cannot be drawn from the undisputed facts." *Graham*, 915 F.2d at 1093. That standard is met here, so the court will grant summary to the district on the scope-of-employment issue.

Here's where we have landed on the claims against Kruchten: (1) summary judgment will be granted to plaintiffs and against Kruchten on the Fourth Amendment claim; (2) summary judgment will be granted to Kruchten (and all the defendants) on the Due Process and Equal Protection claims; (3) summary judgment will be granted to the district on the issue of scope of employment; and (4) the parties will be directed to show cause why summary judgment should not be granted to plaintiffs on their invasion-of-privacy claim against Kruchten.

## B. Other individual defendants

Plaintiffs assert constitutional claims against three other individuals: (1) Joe Fanning, who was a co-chaperone with Kruchten; (2) Heidi Tepp, who was the human resources director for the district; and (3) Joe Balles, who was a security consultant for the district. The district moves for summary judgment on all of these claims.

### 1. Fanning

Fanning was a teacher for the district, and he acted as a co-chaperone with Kruchten on overnight field trips 11 times over three years. Plaintiffs' claim is that Fanning failed to intervene to stop Kruchten from violating plaintiffs' rights. On a failure-to-intervene claim, the plaintiff must show two things: (1) the defendant "had reason to know" that the other person

24

was violating the plaintiff's constitutional rights; and (2) the defendant had a "realistic opportunity" to prevent the violation. *Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

Both Fanning and Kruchten deny that Fanning was aware of the secret recordings. Dkt. 257, ¶ 141. But plaintiffs contend that Fanning had "reason to know" about them for the following reasons:

- The check-in process took a long time, sometimes as long as an hour, and Fanning would have known how unusual that is.

- Kruchten was hanging out with students in their rooms late at night, and Fanning was Kruchten's roommate, so Fanning must have known where Kruchten was.

- Kruchten was putting some female students in upgraded suites, and Fanning must have known that.

- When the students discovered cameras, Fanning did not report this to anyone, and he did not give a statement to the police.

- Fanning deleted all his text messages from the field trip that ended with the discovery of the hidden cameras.[5]

Plaintiffs' argument appears to be based on two different theories. The first is that Kruchten's unusual behavior gave Fanning notice of the constitutional violations. The second is that Fanning was Kruchten's accomplice. No reasonable jury could accept either theory based on the evidence that plaintiffs cite.

---

[5] Plaintiffs also say that, after Kruchten's arrest, Fanning "minimize[ed]" Kruchten's conduct and "suggest[ed] it was no big deal that the girls' pictures were probably on the dark web." Dkt. 241, at 94. Regardless of the relevance of that allegation, it is not supported. Plaintiffs cite Fanning and Tepp's deposition to support the allegation. Dkt. 261, ¶¶ 619–20. But Fanning denied making a comment about the dark web, Dkt. 154, at 120:10–121:8, and Tepp said that she did not recall the comment, Dkt. 198, at 292:1–8.

As an initial matter, this court has previously noted that it is not clear exactly what "reason to know" means, and the court of appeals has not provided clarification. *Voegeli v. City of Janesville*, No. 20-cv-845-jdp, 2021 WL 4501837, at *8 (W.D. Wis. Oct. 1, 2021). Some cases drop the "reason to" and ask simply whether the defendant "knew that a constitutional violation was committed." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). The distinction between "know" and "reason to know" is usually not important because failure-to-intervene claims arise almost exclusively in the context of excessive force, when all the defendants were on the scene and able to observe what was happening. *See, e.g., Mwangangi v. Nielsen*, 48 F.4th 816, 831 (7th Cir. 2022); *Stewardson,* 43 F.4th at 736; *Doxtator v. O'Brien*, 39 F.4th 852, 865 (7th Cir. 2022); *Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008); *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005); *Yang*, 37 F.3d at 285. The more common dispute is over whether an officer had a realistic opportunity to intervene. *See id.*; *see also Miller v. Gonzalez,* 761 F.3d 822, 826 (7th Cir. 2014). Plaintiffs cite no cases in which any court applied the doctrine in a situation in which the defendant could not observe the other person committing the constitutional violation, and they cite no cases in which the court applied the doctrine to a situation remotely similar to this case.

Without citation to authority, plaintiffs suggest that "reason to know" means something akin to recklessness. But even if the court assumes that is correct, plaintiffs' evidence comes nowhere close to that standard.

As for Kruchten's suspicious behavior, plaintiffs cite summaries of interviews with students who describe a practice called "DECA after dark." This involved late-night conversations that Kruchten had with students in their hotel rooms, during which they would talk about personal matters, including his marriage and the students' romantic interests.

26

Dkt. 261, ¶¶ 510–11.[6] Plaintiffs also cite evidence that Fanning was a co-chaperone on two field trips where Kruchten purchased an upgraded suite for some students. *Id.*, ¶¶ 462b, 462f.

Fanning denies knowing anything about Kruchten's late-night hangouts or the upgraded suites. *See, e.g.*, Dkt. 257, ¶¶107–08, 139.  It is undisputed that none of the students reported this behavior to anyone until after December 2019. And plaintiffs' own proposed findings of fact state that "Fanning had no idea what the rooming assignments were for the children," that he never asked to look at room invoices, and that "Fanning's understanding was that Kruchten was responsible for all aspects of the trip and Fanning's role was just to assist Kruchten and do what Kruchten said." *Id.*, ¶¶ 473, 492, 501. Plaintiffs also cite no evidence that Kruchten that there were any "DECA after dark" incidents during trips that Fanning chaperoned.

But even if the court assumes that Fanning must have known about the separate rooms and the late-night hangouts, that would not be enough to support a claim against Fanning. If Fanning knew those things, a reasonable jury could find that Fanning had notice that Kruchten was doing something inappropriate with students, perhaps even engaging in sexual misconduct. But it is undisputed that Kruchten did not have any sexual contact with a student during these conversations or at any other time. Dkt. 257, ¶ 134. Fanning cannot be held responsible for failing to prevent an assault that never occurred. Plaintiffs identify no reason why the evidence they cite would give Fanning notice that Kruchten was *secretly recording* students, which is the only constitutional violation alleged in this case.

---

[6] The district objects to these summaries as hearsay, but it is not necessary to resolve that objection because the district is entitled to summary judgment regardless of whether the court considers the summaries.

As for the long check-in times, that might give Fanning reason to suspect that something odd was happening. But evidence of "something fishy" is not enough to show recklessness. *See Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 694–95 (7th Cir. 2008) (tort law "generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware").

This leaves Fanning's conduct after the hidden cameras were discovered in 2019: he did not report the matter to the police, he did not give a statement to the police right away, and he deleted his text messages. That conduct happened after the fact, so it could not have given Fanning notice of anything. The court understands plaintiffs' position to be that the conduct is circumstantial evidence that Fanning knew all along what Kruchten was doing, and Fanning was complicit, wanting to help Kruchten cover it up.

The theory is speculative, and speculation does not raise a genuine issue of material fact. *Devbrow v. Gallegos*, 735 F.3d 584, 587–88 (7th Cir. 2013); *Springer v. Durflinger*, 518 F.3d 479, 484–85 (7th Cir. 2008). As for failing to contact the police, Fanning says that he did not know the devices were hidden cameras before he left the hotel. Dkt. 257, ¶¶ 103, 115. Plaintiffs say that testimony is implausible because Fanning looked at the devices for five minutes. But plaintiffs do not explain what about the device would have made it obvious to Fanning that it was a camera. They say only that he saw wires and a USB device. *Id.*[7] In any event, it is not reasonable to infer from a lax attitude that Fanning was part of a cover up. Kruchten told Fanning that he (Kruchten) would handle the situation, which is consistent with Fanning's

---

[7] Plaintiffs also say that Fanning's testimony is inconsistent with a police report, Dkt. 237-20, but the police report is hearsay, *see Cairel v. Alderden,* 821 F.3d 823, 830–31 (7th Cir. 2016), and plaintiffs identify no hearsay exception that would apply.

normal course of allowing Kruchten to take the lead. Further, hotel staff did not contact the police either. Dkt. 257, ¶¶ 112–13. Plaintiffs cite no evidence that Fanning tried to discourage anyone from reporting the matter or that he attempted to conceal evidence. *Id.*, ¶ 114.

As for Fanning's initial failure to provide a statement to the police at the hotel, plaintiffs cite no evidence of evasion. Rather, Fanning simply was not aware that the police had been called, and he left the hotel with everyone else before the police arrived. Dkt. 261, ¶ 448. It is undisputed that Fanning voluntarily spoke to the police multiple times on later dates.

As for deleting text messages, plaintiffs rely on an unauthenticated document that appears to be a transcript of a telephone conversation between Fanning and an officer from the Minneapolis Police Department in January 2020. Dkt. 237-19. Even if the court sets aside the problems with authenticity and hearsay, plaintiffs do not explain how the document is evidence of a conspiracy between Kruchten and Fanning related to the secret recordings. In the document, the officer explains that the department has Kruchten's phone and that the officer can see Kruchten's text messages to Fanning, but he cannot see Fanning's text messages to Kruchten. Fanning's response to the officer was that he usually deletes text messages shortly after sending them and that he had "maybe a dozen" text messages on his phone at that moment. *Id.* at 1.

Plaintiffs do not cite any evidence challenging Fanning's statement that his general practice is to delete all his text messages. Instead, plaintiffs say that "no one has been able to explain how [Fanning's] texts to Kruchten were not only deleted from Fanning's phone, but from *Kruchten's* too." Dkt. 241, at 94 (emphasis in original). Plaintiffs do not say that they *asked* anyone to explain this phenomenon. Regardless, plaintiffs do not identify any reason to believe that Fanning's text messages are incriminating in some way. After all, the officer said

that he *did* have Kruchten's side of the conversation. If Kruchten and Fanning were conspiring, there would be some indication of that from Kruchten's messages. Neither the transcript nor plaintiffs indicate that Kruchten's messages to Fanning were inculpatory in any way.

Plaintiffs have adduced no evidence that Fanning knew or had reason to know that Kruchten was secretly recording students. The court will dismiss plaintiffs' claims against Fanning.

### 2.  Tepp

Tepp was the district's human resources director. Plaintiffs' second amended complaint asserts claims under the Due Process Clause and Equal Protection Clause against Tepp, but not the Fourth Amendment. The court is dismissing the due process and equal protection claims, which raises the question whether it is necessary to consider plaintiffs' arguments about Tepp. But both sides assume in their briefs that plaintiffs are also asserting a Fourth Amendment claim against Tepp, so the court will as well.

Plaintiffs say little about their claim against Tepp in their brief, devoting less than two pages of their 104-page opposition brief to the claim. Plaintiffs do not contend that Tepp was involved in recording any of the plaintiffs or that she authorized Kruchten to make the recordings. Nor do they contend that Tepp knew or even suspected that Kruchten was recording students or otherwise engaging in misconduct. Dkt. 257, ¶ 143–44 Tepp denies that she had any responsibility over school field trips, and plaintiffs cite no contrary evidence. *Id.*, ¶ 96.

Plaintiffs summarize their theory against Tepp in the following sentence: "A jury could clearly find that Tepp turned a blind eye to and covered up indiscriminate hidden camera use at [the district] for years, and that her actions and inaction contributed to an abusive

environment and a culture of reckless disregard of the constitutional rights of staff and students." Dkt. 241, at 96. In other words, plaintiffs' position is that Tepp can be held liable for Kruchten's secret recordings because she did not stop hidden cameras from being used in other contexts.[8]

Plaintiffs point to several other instances in which someone within the district used a hidden camera on school premises to uncover suspected misconduct, usually by an employee:

- Between 1999 and 2011, the former director and assistant director of human resources authorized use of a hidden camera at East High School to catch a custodian sleeping. The parties do not say where the camera was or whether any students could have been recorded. Dkt. 261, ¶ 378; Dkt. 257, ¶ 179.

- Between 25 and 11 years ago, Joe Anderson (the district's manager of electrical technology) and the former human resources director authorized use of a hidden camera in the food service office at Leopold Elementary School in an attempt to catch an employee stealing. Dkt 261, ¶¶ 381–82; Dkt. 257, ¶ 180. The parties do not say whether any students could have been recorded.

- Between 2013 and 2019, Anderson placed a hidden camera in the school nurse's office at East High School to investigate the possible theft of drugs. Dkt. 261, ¶¶ 249–51; Dkt. 257, ¶ 181. The parties do not say where the camera was pointed or whether it was possible that the camera recorded students undressing.

- Between 2013 and 2019, Anderson placed a hidden camera in the main office at East High School to investigate the theft of money. The parties do not say whether any students could have been recorded. Dkt. 261, ¶¶ 252–54; Dkt. 257, ¶ 182.

- In September 2019, custodial supervisors suspected that a night janitor was sleeping on the job. As a result, Anderson installed two hidden cameras at East High to investigate this. Anderson put the cameras in locations where it was believed that the janitor might be sleeping. One was in "Room 127," which was used for occupational and physical therapy; that room included cots that were sometimes used for changing diapers of special education students. The other location was a coach's office inside the boy's locker room; the office included a

---

[8] Plaintiffs also say that Tepp failed to conduct thorough investigations of previous instance of sexual misconduct by district staff, Dkt. 241, at 96, but plaintiffs do not explain how any of those past instances would have given Tepp notice of what Kruchten was doing, so plaintiffs forfeited that argument.

couch. Tepp received an email about the installation of these cameras, and she did not object, but she did not expressly approve the cameras either. Dkt. 261, ¶¶ 260, 273, 276, 289–90, 310, 338; Dkt. 257, ¶¶ 171–74.

Plaintiffs do not cite any evidence that Tepp was aware of any of the hidden cameras other than the ones that were installed in September 2019. But the court need not decide whether Tepp was responsible for the use of any hidden cameras at school or whether that use of hidden cameras violated the constitutional right of any students. Plaintiffs' claims are not about the district's use of hidden cameras on school premises, and plaintiffs do not allege that they were recorded by cameras at the school. The court will assume for the purpose of defendants' summary judgment motion both that the district's use of hidden cameras violated the Fourth Amendment and that Tepp was responsible for the use of at least some of those cameras.

The problem is that plaintiffs have not shown a causal connection between the use of hidden cameras at school and Kruchten's conduct. Case law often refers to causation under § 1983 as "personal involvement." A common summary of the standard for supervisors is provided in *Hess*: "To claim personal liability against a supervisor for a supervisee's conduct, a plaintiff must plausibly allege that the supervisor played some role in the conduct through facilitation, approval, or turning a blind eye for fear of what they might see." 72 F.4th at 768. The standard is somewhat imprecise. In other cases, the court has explained that causation for a constitutional tort is divided into two types: (1) cause-in-fact, or whether the injury would have been prevented if the defendant had acted differently; and (2) proximate cause, or whether the plaintiff's injury was reasonably foreseeable. *See Whitlock v. Brueggemann*, 682 F.3d 567, 582–83 (7th Cir. 2012). That is a more useful way of analyzing causation in this case.

Plaintiffs' claim against Tepp fails under both types of causation. As for cause-in-fact, plaintiffs cite no evidence that Kruchten was influenced by or even aware of the district's use of hidden cameras at school, and they cite no evidence that Kruchten's misconduct could have been prevented if the district had not used hidden cameras.

As for proximate cause, it would not have been reasonably foreseeable that using hidden cameras to detect employee misconduct on school premises would lead to a school chaperone secretly video recording students in hotel bathrooms. It is undisputed that Kruchten's conduct was against district policy. Regardless of whether the district's use of hidden cameras was appropriate, it bears no relation to what Kruchten did. Even if Kruchten had been aware of the use of hidden cameras in other contexts, it would not have been reasonable for him to interpret what he did as a logical extension of district practice. As already discussed, Kruchten admitted that he knew placing cameras in the students' rooms was wrong and illegal, that he did not tell anyone at the district about what he was doing because he did not want them to know, and that he knew that the district would not approve of what he was doing. Dkt. 280, ¶¶ 49–52.

The weakness of this claim is demonstrated by the case law that plaintiffs rely on. In *Stoneking v. Bradford Area School District*, the plaintiff was a student who was physically and sexually abused by a school employee. 882 F.2d 720, 722 (3d Cir. 1989). The defendants were school administrators who had previously received complaints from students about sexual and physical abuse by the employee, and the defendants failed to take action to prevent further assaults. *Id.* The facts in *T.E. v. Grindle* were similar. 599 F.3d 583, 585–87 (7th Cir. 2010). The defendant was a school administrator who had received complaints about sexual misconduct by an employee against a student, and the administrator did not intervene. In both

cases, the court held that the administrators could be held liable under the Due Process Clause for disregarding the risk that the school employee posed to students.

*Stoneking* and *T.E.* are readily distinguishable. In both cases, the defendants knew about allegations that an employee was abusing students. Again, it is undisputed in this case that Tepp had no information suggesting that Kruchten was secretly recording students or engaging in other misconduct. Thus, Tepp's situation is more like *Trentadue v. Redmon*, 619 F.3d 648, 653 (7th Cir. 2010), in which the court granted summary judgment to a school administrator in a sex abuse case because the plaintiff adduced no "evidence that [the defendant] knew about [the employee's] sexual misconduct and facilitated, approved, condoned, or turned a blind eye to it."

The court will grant summary judgment to Tepp.

### 3. Balles

Balles was a security consultant, and he was an independent contractor for the district. As with Tepp, plaintiffs did not assert a Fourth Amendment claim against Balles in their second amended complaint, but both sides assume that plaintiffs are asserting a Fourth Amendment claim, so the court will do the same.

Plaintiffs' claim against Balles is similar to their claim against Tepp. They contend that Balles approved the hidden cameras at school, so he can be held responsible for Kruchten's secret recordings. Balles seeks summary judgment on several grounds: he was not acting under color of law, he was not responsible for making or implementing district policy on using cameras, he was not even aware of the use of hidden cameras, and he did not cause the constitutional violations against plaintiffs. The court need not decide whether Balles acted under color of law, what he was responsible for, or what he knew about the hidden cameras at

school because plaintiffs' claim against Balles fails for the same reason as their claim against Tepp: plaintiffs have not adduced evidence of causation. Specifically, plaintiffs have not shown either that Kruchten's conduct was reasonably foreseeable to Balles or that any intervention by Balles regarding the use of hidden cameras at school would have prevented the constitutional violation at issue in this case.

The court will grant summary judgment to Balles.

## C. Municipal liability

Plaintiffs contend that the school district can be held liable for violating their constitutional rights by failing to stop Kruchten from making his secret recordings. The district moves for summary judgment on this claim. Before considering that aspect of the district's motion, the court must consider plaintiffs' argument that default judgment should be entered against the district.

### 1. Motion for sanctions

After summary judgment briefing was completed, plaintiffs filed a motion for sanctions in which they contend that the district lied in one of its discovery responses, so the court should enter default judgment against the district. Dkt. 298. Plaintiffs seek no other sanction as an alternative if their request for a default judgment is denied.

Plaintiffs' motion centers on the district's September 2022 response to an interrogatory asking the district to identify every time it used hidden cameras in the past. Dkt. 33-8. The district's response was cautiously worded, stating that "the only definitively known" use of hidden cameras was the September 2019 incident involving cameras in the therapy room and coach's office. *Id.* The district's in-house counsel, Sherry Terrell-Webb, verified that the

response was "accurate to the best of [her] knowledge and belief," but she did not say what information she had reviewed to make that determination. Dkt. 33-9.

Plaintiffs then moved to compel the district to supplement its response, contending that they had reason to believe there had been other uses of hidden cameras. Dkt. 32. They cited a 2021 email from Mark Brown, the district's security director, discussing an internal investigation in which Tepp acknowledged past uses of hidden cameras other than the September 2019 incident. *Id.* at 6 (citing Dkt. 33-2). The district opposed the motion, arguing that its interrogatory response was sufficient and that "there is nothing that would require the District to accept a former employee's [Tepp] alleged, uncorroborated recollection as being irrefutable." Dkt. 37, at 4. Accompanying the district's brief was a declaration from Terrell-Webb stating the following:

> I have spoken to a number of individuals who, based upon my belief, might have knowledge as to any instances when concealed cameras were used within the District during the period from 2010 to 2019. None of the individuals who I have communicated with regarding alleged concealed camera usage within the District during the period from 2010 to 2019 were able to definitively state whether there had been any such usage. I am unaware of any records held by [the District], or current employees working at [the District] with personal knowledge, that would enable the District to definitively state that concealed cameras had been used within the District during the period from 2010 to 2019, other than those used in connection with the Madison East High School investigation that is referenced in Plaintiffs' Amended Complaint in this action.

Dkt. 38, ¶ 4. Terrell-Webb did not identify the individuals she spoke to, why she spoke to them and not others, or what she meant when she said that those individuals could not "definitively state" whether other hidden cameras had been used.

After holding a hearing on the motion to compel, Magistrate Judge Crocker issued a text-only order that included the following language:

> After discussion between the parties and the court, we reached a consensus on how to move forward: plaintiffs will notice former [district] employee Tepp for deposition, with Attorney Harlan representing her. The court declined to strike [the district's] objections to Interrogatory No. 1 and it will not forbid Tepp from properly invoking attorney-client privilege during her deposition, but if the court later were to conclude that [the district] has improperly withheld responsive information, then there will be sanctions.

Dkt. 41.

Nearly a year and a half later, the parties filed their summary judgment submissions. By that time, plaintiffs had obtained discovery identifying the other uses of hidden cameras within the district that the court discussed in Section B.2. That discovery included a supplemental response to the interrogatory, which the district provided in February 2024. Dkt. 238-2. Plaintiffs also relied on the depositions of former employees such as Tepp and Anderson. Both sides submitted proposed findings of fact about each of the prior incidents, and those facts are largely undisputed.

Now plaintiffs contend that the court should enter default judgment against the district because Terrell-Webb committed "perjury" when she verified in 2022 that she was not aware of other uses of hidden cameras besides the September 2019 incident. In support of that allegation, plaintiffs rely primarily on several portions of the deposition of Mark Brown, who was the district's security director between 2019 and 2022:

- In 2021, the district conducted an internal investigation about the September 2019 incident; both Heidi Tepp and Jo Anderson were interviewed as part of that investigation. Dkt. 292, at 65:9–66:7.

- Brown sent an email to Terrell-Webb about that investigation, and he wrote "thanks for your work on this." *Id.* at 62:14–63:19.[9]

- Terrell-Webb had participated in meetings about that investigation. *Id.* at 86:18–87:24.

- During a meeting about the 2019 investigation, someone had brought up a previous use of a hidden camera that "had been done at an elementary school . . . over a theft of money." *Id.* at 89:16–17.

Plaintiffs' argument is that Tepp and Anderson were both aware of the previous uses of hidden cameras, so if they gave interviews during the 2021 investigation, and Terrell-Webb was part of that investigation, she must have known about the previous uses of hidden cameras when she verified the district's interrogatory response. Or at a minimum, she learned during a meeting about the use of a hidden camera at the elementary school.

Plaintiffs cite two other pieces of evidence. First, they cite the testimony of Carlton Jenkins, the district's former superintendent, that he was aware in January 2021 that *Tepp* was aware about previous uses of hidden cameras. Dkt. 230 at 146:7–147:14. Second, they cite an email about the 2021 investigation that Chad Wiese (the head of building services) was copied on, and they cite Terrell-Webb's testimony that she spoke to Wiese about previous uses of hidden cameras before verifying the district's interrogatory response. Dkt. 42, at 33:23–35:6. From this, plaintiffs say that either Terrell-Webb or the district knew when the district answered the interrogatory that there were other uses of hidden cameras besides the September

---

[9] Plaintiffs' counsel used that email to examine Brown, but counsel did not provide the email to the court with their sanctions motion. Brown was equivocal during the examination about what the email meant, stating, "I don't know if this was sent—this summary was sent to me by [Terrell-Webb] for review—I'm assuming. I don't know if this was sent to me from her to review and me saying to her thanks for your help. I don't know." Dkt. 292, at 63:7–11.

2019 incident. Plaintiffs believe that the district "intentionally withheld" this knowledge, so a default judgment is "appropriate." Dkt. 298, at 9, 15.

Granting default judgment for litigation misconduct is rare because there is a strong policy in this circuit of deciding cases on the merits rather than on procedural grounds. *See Sun v. Bd. of Trustees of Univ. of Ill.*, 473 F.3d 799, 811 (7th Cir. 2007). Default judgment is a drastic sanction and should be used only as a "weapon of last resort." *See id.* Even perjury does not necessarily require such a harsh sanction. *See Montano v. City of Chicago*, 535 F.3d 558, 563 (7th Cir. 2008). The court considers how willful the party's conduct was and how material any false statements were. *Id.* The bottom line is that the sanction must be proportionate to the gravity of the offense. *Id.*

The court is not persuaded either that Terrell-Webb or the district committed perjury or that plaintiffs are entitled to a default judgment. As for whether Terrell-Webb lied, plaintiffs provide little information in their sanctions motion that they did not already know in October 2022 (around the time that Magistrate Judge Crocker ruled on their previous motion to compel). At that time, plaintiffs already knew the following things:

- The district conducted an internal investigation in 2021.

- Tepp had been interviewed for that investigation, and she discussed previous uses of hidden cameras within the school district.

- Terrell-Webb had received an email from Brown about the investigation saying, "thanks for your work on this."

- Terrell-Webb spoke to Wiese before verifying the district's interrogatory answer.

- Terrell-Webb's position is that she does not remember being part of the 2021 investigation.

This information was either discussed in plaintiffs' motion to compel or disclosed during Terrell-Webb's October 2022 deposition. Dkt. 43, at 242:16–243:9.[10]

The only new information about Terrell-Webb's knowledge discussed in plaintiffs' sanctions motion is Brown's recollection that Terrell-Webb had attended meetings about the 2021 investigation, and one previous use of hidden cameras was discussed at one of those meetings. That is not persuasive evidence that Terrell-Webb committed perjury, and it provides little reason to question Terrell-Webb's testimony that she does not remember the investigation. Plaintiffs do not cite any testimony from Brown suggesting that Terrell-Webb played a significant role in the investigation or that she could confirm details about past uses of hidden cameras. The email showing that Wiese was receiving information about the investigation and that Terrell-Webb spoke to Weise is not probative because plaintiffs do not cite any evidence that Wiese was significantly involved either. Jenkins's statement that he was aware of Tepp's statement adds nothing because plaintiffs were already aware of Tepp's statements in 2022.

As discussed during the hearing on the motion to compel, neither the district nor Terrell-Webb represented that there were no other uses of hidden cameras within the district. Rather, their position was that they could not "definitively" say whether there were other uses for the purpose of answering an interrogatory because they did not have any documentation, and Tepp no longer worked for the district. Dkt. 302, at 3:7–15, 6:18–8:8. (Anderson had also resigned before the lawsuit was filed. Dkt. 227 (Anderson Dep. 7:20–25)). Plaintiffs do not point to any documents on this issue that the district failed to turn over. The evidence plaintiffs

---

[10] Plaintiffs also knew in 2022 that Brown had conducted the internal investigation. They do not explain why they waited until May 2024 to depose him.

cite show only what we already knew in 2022: there was an investigation in 2021 during which employees discussed past uses of hidden cameras.

Even now, plaintiffs do not explain how the district should have answered the interrogatory differently. It is important to point out that the interrogatory did not ask for all information that might help plaintiff determine for themselves when and how district employees had used hidden cameras in the past. Rather, plaintiffs wanted details, including "the approximate date(s) and location(s), each [district] employee or agent with contemporaneous knowledge of the same, the make and model of each camera or device used, the method and manner of procurement and installation for each, and the purpose or justification of each placement or use." *Id.* Even assuming that Terrell-Webb had heard second or third-hand information about previous uses of hidden cameras, she could not have provided the details that plaintiffs were seeking. In sum, plaintiffs have not shown that Terrell-Webb or anyone else committed perjury or otherwise tried to mislead plaintiffs.

Even if plaintiffs could show that the district should have provided more information in their interrogatory response, the court would not enter default judgment against the district, for two reasons. First, plaintiffs have not pointed to any way in which the district's interrogatory response prevented plaintiffs from proving their case. They do not ask to present new evidence they uncovered because of Brown's deposition, and they do not allege that the district is hiding information about more past uses of hidden cameras.

The only reference to prejudice in plaintiffs' motion is that they "conducted self-help through further, much more expensive and time consuming deposition discovery." Dkt. 298, at 7. But plaintiffs do not explain what they mean by this. If the district had admitted to the four other uses of hidden cameras in an answer to an interrogatory, would plaintiffs have

decided not to depose former employees like Tepp and Anderson? That seems highly unlikely. Again, there is no allegation that the district has withheld documentation about the past uses of hidden cameras, so the district could not have provided details about those past uses without interviewing the former employees themselves. Magistrate Judge Crocker asked plaintiffs' counsel point blank during the hearing, "[W]ould you rather have [defense counsel] get the information from Ms. Tepp and provide it to you, or would you rather just tee up a deposition and get it directly from her? I'll let you do whatever you want." Dkt. 302, at 5:17–20. Plaintiffs' counsel did not say that she wanted the district to get the information. Rather, she replied that she is "planning on taking Ms. Tepp's deposition." *Id.* at 21–22. In any event, plaintiffs are not asking for fees or expenses for the time spent on those depositions, so it is not necessary to consider whether shifting expenses is appropriate.

Second, the information that plaintiffs were seeking in their interrogatory, and that they ultimately obtained, does not make any difference to the outcome of this case. As already discussed in the context of plaintiffs' claim against Tepp (and will be discussed further in the context of plaintiffs' claim against the district), the past uses of hidden cameras in the district are not helpful for plaintiffs because they are too different from Kruchten's use of hidden cameras. That rabbit hole led only to a dead end.

To some extent, the court understands plaintiffs' frustration over the district's failure to provide a more helpful interrogatory response. The district should have been able to provide plaintiffs with a clear and complete response that identified its employees' past uses of hidden cameras. But poor recordkeeping is not a basis for entering a default judgment, or for accusing the district of lying. Plaintiffs' motion for sanctions is denied.

In addition to filing a brief in opposition to the sanctions motion, the district filed a motion to strike "plaintiffs' claims of perjury." Dkt. 303. The gist of this motion is that plaintiffs' allegations are unsupported and potentially damaging to Terrell-Webb's reputation, so the court should "strike all allegations of perjury from Plaintiffs' filings." *Id.* at 7.

An allegation of perjury is indeed a serious charge. Plaintiffs' use of the term was irresponsible, and their motion was ill advised. As the court has explained, plaintiffs have little evidence of any intent to mislead by the district or Terrell-Webb, let alone of perjury. That being said, the district does not explain what purpose is served by "striking" plaintiffs' allegations. The court cannot remove the allegations from the docket. The case the district cites says that motions to strike are granted to "prevent[] a jury from seeing the offensive matter or giving the allegations any other unnecessary notoriety." *Cobell v. Norton*, No. Civ.A. 96–1285, 2003 WL 721477, at *1 (D.D.C. Mar. 3, 2003). But there would be no reason for the jury to see the allegations, and the court has already explained that plaintiffs' allegations are unsupported. The court will deny the motion to strike as unnecessary.

The court will now turn to the district's motion for summary judgment.

**2.  Merits**

A constitutional claim against a municipal defendant such as the district requires the plaintiff to prove four things: (1) a constitutional deprivation; (2) action or inaction by the municipal defendant or its employees that can be fairly described as the municipality's policy; (3) notice to the defendant that its policy would lead to constitutional violations; and (4) a direct causal connection between the defendant's policy and the constitutional injury. *See Estate of Wallmow v. Oneida Cnty.,* 99 F.4th 385, 393–94 (7th Cir. 2024); *Thomas v. Neenah Joint School District*, 74 F.4th 521, 524 (7th Cir. 2023); *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675

(7th Cir. 2022); *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986–87 (7th Cir. 2021). The court has concluded that there was no due process or equal protection violation, so the court will dismiss those claims against the district. But the court has concluded that Kruchten did violate plaintiffs' Fourth Amendment rights, so the court need not consider again whether there was a constitutional deprivation.

As for action or inaction of the district that can be fairly described as district policy, plaintiffs do not point to an express district policy that authorized Kruchten's conduct. In fact, district policy prohibited what Kruchten did in multiple ways. Specifically, district policy prohibits the use of cameras in restrooms, locker rooms, or changing rooms, and it prohibits using a camera to capture "a nude or partially nude person" in those areas. Dkt. 257, ¶¶ 45– 49; Dkt. 280, ¶¶ 41–43. District policy also requires the superintendent to approve the use of hidden cameras for any reason. *Id.* It is also clear that the district did not approve of Kruchten's conduct. The district put Kruchten on leave within two days of learning that he may have used hidden cameras to spy on students, and he never returned. Rather than point to an express policy or statement of approval, plaintiffs say that the policy was the result of inaction, namely, the district's failure to train its employees on two key matters related to this case: (1) proper supervision of students, including the use of hidden cameras; and (2) preventing and detecting sexual abuse of students.[11]

---

[11] Plaintiffs also propose numerous facts about the district's failure to adequately investigate or otherwise respond after it learned in December 2019 that Kruchten had been secretly recording students. Dkt. 261, ¶¶ 566–631. The court previously dismissed any claim based on the district's failure to investigate after the fact, *see* Dkt. 45, and plaintiffs do not explain in their brief how those facts are otherwise relevant, so the court has not considered them.

A failure to act, including a failure to train, can qualify as a policy for the purpose of municipal liability because a "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the [municipality] itself to violate the Constitution." *Fields v. City of Chicago*, 981 F.3d 534, 562 (7th Cir. 2020) (internal quotation marks omitted). But the Supreme Court has placed strict limits on municipal liability claims based on a failure to train, reasoning that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011). This is because a failure to train is "a good deal further removed" from a subsequent constitutional violation than a violation that is the result of a direct implementation of a policy. *Id.* (*quoting Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality opinion)). There is always something that a municipality could have done differently to prevent a constitutional violation, so a high standard of fault and causation is needed to prevent subjecting municipalities to general vicarious liability. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 391–92 (1989).

The Supreme Court has used the phrase "deliberate indifference" to refer to the standard for imposing liability on a municipality for failure to train. *Id.* This requires the plaintiff to show that the defendant knew either that constitutional violations were likely to occur because of the failure to train or that such a risk was obvious. *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 379–81 (7th Cir. 2020). A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to provide such notice. *Board of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997); *see also Dean v. Wexford Health Sources, Inc.,* 18 F.4th 214, 240 (7th Cir. 2021) ("[W]e have repeatedly rejected . . . claims [against municipal defendants] that rest on the plaintiff's individualized experience without evidence of other

45

constitutional violations."). Past violations are not required to provide notice in the rare circumstance that a constitutional violation is a "patently obvious" consequence of a failure to train. *Connick*, 563 U.S. at 63. Plaintiffs cannot satisfy this standard for either of the alleged failures to train.

### a. Failure to train: proper supervision of students

Plaintiffs contend that the district failed to train its employees on the proper limits of supervising students, including on whether or when to use hidden cameras. Plaintiffs say that the district had notice that its failure to train was likely to lead to constitutional violations, both because of past unconstitutional uses of hidden cameras in the school district and because it was obvious that the failure to train would lead to constitutional violations.

Plaintiffs are correct that the district did little to train its employees on whether or when it was appropriate to use hidden cameras to record students. In fact, the district points to no training that it conducted on using hidden cameras specifically *or* more generally on appropriate supervision for chaperones, and it took no steps to communicate to employees its restrictions on using hidden cameras. When he chaperoned students, Kruchten was required to initial statements that he would follow district policies, Dkt. 280, ¶¶ 29, 33, but the district does not say that Kruchten ever received explicit instruction regarding the use of hidden cameras on field trips or more generally on being a chaperone. Kruchten says that he was not aware of the policies on using cameras, and plaintiffs cite testimony from district officials who say that even they were unaware of the policies. Dkt. 190 (Kruchten Dep. 110:9–14, 111:3–9); Dkt. 261, ¶¶ 635, 643. "[I]gnoring a policy is the same as having no policy in place in the first place." *Woodward*, 368 F.3d at 929.

But plaintiffs must do more than show lax enforcement of the hidden-camera policies or a failure to train on proper supervision methods. Plaintiffs must also show that these failures gave the district notice that a constitutional violation was likely and directly caused Kruchten's misconduct. *Wallmow*, 99 F.4th at 393–94. For the reasons explained below, plaintiffs cannot satisfy those requirements, either through a history of past violations or because constitutional violations like Kruchten's were the obvious consequence of a failure to train.

**Past violations: use of hidden cameras.** Plaintiffs first attempt to show notice through a series of past uses of hidden cameras on school property. This argument is similar to the one against Tepp and Balles. Plaintiffs say that the district "was deliberately indifferent to the Fourth Amendment privacy rights of its students through its tolerance of pattern and practice of indiscriminate and unreasonable hidden camera use." Dkt. 241, at 66. Plaintiffs point to the same five examples of hidden camera use between 1999 and 2019 that the court discussed in Section B.2. As already noted, all five of those incidents were attempts to investigate theft or a sleeping employee.

A de facto municipal policy can be inferred when the municipality tolerates "a series of unconstitutional acts," *Hahn v. Walsh*, 762 F.3d 617, 637–38 (7th Cir. 2014), because condoning violations is itself a deliberate choice by the municipality, *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004). As it did in the discussion of the claim against Tepp, the court will assume that the uses of hidden cameras on school premises violated the Fourth Amendment. But this assumption does not help plaintiffs because those incidents neither gave the district notice of the risk of what Kruchten would do nor had any causal connection with Kruchten's conduct.

When a plaintiff relies on a pattern of past constitutional violations to provide notice, the pattern must be "so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61. Plaintiffs cite no authority for the proposition that five incidents over 10 to 20 years is a sufficient pattern, and many cases suggest the opposite. *See Orozco v. Dart*, 64 F.4th 806, 825 (7th Cir. 2023) (concluding that plaintiffs did not establish a policy by citing evidence of possible violations "a few times in a multi-year span"); *Hildreth v. Butler*, 960 F.3d 420, 430 (7th Cir. 2020) (eight incidents over six years not enough); *Bridges v. Dart*, 950 F.3d 476, 480 (7th Cir. 2020) (collecting cases holding that several incidents over several years does not demonstrate a policy).[12]

Plaintiffs also cite little evidence that officials representing the district or the school authorized or even knew about the use of hidden cameras. When lax enforcement of a policy is the basis for municipal liability, the plaintiff must show that "acquiescence on the part of policymakers was apparent." *Estate of Wallmow*, 99 F.4th at 394 (internal quotation marks omitted). There is no evidence that the superintendent approved any of the uses of hidden cameras. Rather, most of them were authorized by the manager of electrical technology, who failed to get approval from the superintendent, despite knowing it was required. Dkt. 261,

---

[12] Plaintiffs state in their brief that a jury could infer that there were more incidents because the district did not require uses of hidden cameras to be documented. Dkt. 241, at 66. Plaintiffs cite no authority for that view, they cite no evidence of other uses (not even hearsay or rumor), and they do not suggest that they have met the demanding standard for obtaining an adverse inference. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644–45 (7th Cir. 2008). The jury may not speculate. *Muhammad v. Caterpillar*, 767 F.3d 694, 700 (7th Cir. 2014). And even if there were other uses of hidden cameras, that fact alone would not be probative without knowing the circumstances. *See Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009); *Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 802 (W.D. Wis. 2021).

¶ 230. Plaintiffs do not explain how Anderson's knowledge or that of other employees involved can be imputed to the district. The district cannot stop what it does not know about.

Even if the court assumes that the previous instances of using hidden camera represent district policy, those instances did not give the district notice of what Kruchten did for a straightforward reason: Kruchten's conduct is miles away from the district's alleged recording practice. The two practices differed significantly in purpose, setting, and context. The previous instances were not attempts to "supervise" students, and they did not involve a teacher doing the recording. To put it simply, attempting to catch a sleeping employee bears little resemblance to spying on nude students in a hotel bathroom.

Plaintiffs say that the district's cameras could have recorded students undressing, but plaintiffs do not cite evidence that the cameras *did* record any students undressing. And plaintiffs cite no evidence that any of the cameras other than the one in the occupational and physical therapy room *could* have recorded students undressing. Plaintiffs state repeatedly that the coach's office was within the boys' locker room, but plaintiffs do not cite evidence that the camera was pointed toward any area where boys would be undressed. Even for the therapy room, plaintiffs cite no evidence that anyone involved in approving the camera was aware that a special education student could be viewed being changed. *See* Dkt. 292 (Brown Dep. 45:13–

14) (testimony of district security director that "[n]obody knew that that room was being used for kids to change in"). And plaintiffs cite no evidence that any student was viewed.[13]

The bottom line is that the district's alleged practice of using hidden cameras cannot be fairly described as a policy of recording nude or partially nude students or of recording students in private areas. The district could not have predicted from some employees' overzealous efforts in investigating employee misconduct that a school chaperone would place hidden cameras in students' hotel rooms without obtaining authorization from anyone.

Plaintiffs resist this conclusion on two grounds, but neither is persuasive. First, plaintiffs say that the jury could reject the district's explanation about why employees used hidden cameras in the past. It is true that the court must view the evidence in the light most favorable to plaintiffs, *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314–15 (7th Cir. 2011), but this extends to drawing reasonable inferences only, *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Plaintiffs cite no evidence that any of the prior uses of hidden cameras were attempts to spy on students' private moments. As previously noted, plaintiffs cannot defeat a motion for summary judgment with speculation. *Devbrow*, 735 F.3d at 587–88.

Second, plaintiffs say that the purpose of the prior uses of hidden cameras is irrelevant because the Fourth Amendment uses an objective standard: the question is whether the search was reasonable; the reasons for the search do not matter. Dkt. 241, at 74 (citing *Hess*, 72 F.4th

---

[13] The district says that cameras in the coach's office and therapy room were programmed to record only between 10 p.m. and 6 a.m., when students would not be present. Dkt. 257, ¶ 172. Plaintiffs say that a live feed could be viewed during other hours if a person knew the IP address, login, and password for the cameras. Dkt. 261, ¶ 215. The district says that a person would also need to use "a district computer . . . that had the appropriate software installed." *Id.* Regardless, plaintiffs do not cite evidence that anyone did view the live feed before 2020, or more important, that any policymaker believed that students would be or could be viewed.

at 762). That is an oversimplification of the law. Reasonableness is the touchstone, but that turns on context, including the reason for the search. A patdown search of a student caught smoking marijuana would be more reasonable than a patdown search conducted for no reason other than sexual harassment.

In any event, plaintiffs are conflating issues. The question is not simply whether the earlier use of hidden cameras gave notice of a potential Fourth Amendment violation of some kind. "[I]t is not enough that a municipality know an employee would be likely to violate a plaintiff's constitutional rights in some kind of general sense." *Wilson v. Cook Cnty.*, 742 F.3d 775, 782–83 (7th Cir. 2014). Rather, there must be a pattern of *similar* violations to provide notice. *Connick*, 563 U.S. at 62; *Bohanon v. City of Indianapolis*, 46 F.4th 669, 676 (7th Cir. 2022). This makes sense because the ultimate question is whether the violation of the plaintiff's rights was a direct result of municipal policy. *See Dean*, 18 F.4th at 236. So the past violations must show that the municipality had notice that "the particular injury suffered by the plaintiff" was "highly likely." *Brown*, 520 U.S. at 412; *see also City of Canton*, 489 U.S. at 391 (previous violations "must be closely related to the ultimate injury").

*Connick* is instructive. In that case, the district attorney's office was sued for violating *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn over a crime lab report and a swatch of the victim's pants that were stained with the assailant's blood. 563 U.S. at 56–57. Courts had previously overturned four convictions from the same office because of *Brady* violations. But the Court held that the past violations would not have given adequate notice for municipal liability because "[n]one of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind," so they were "not similar to the violation at issue here." 563 U.S. at 62–63. *See also Wilson*, 742 F.3d at 782–83 (concluding that sexual

harasser's conduct toward the plaintiff did "not find a comfortable place within the predictable arc of his past conduct" of sexual harassment for the purpose of municipal liability because his "past conduct involved a straightforward abuse of power, whereas in this case his weapon was not power but trickery and lies").

*Connick* demonstrates that simply finding past violations of the same constitutional amendment is not enough to satisfy the notice requirement for municipal liability. Kruchten's conduct was fundamentally different from the previous uses of hidden cameras. Plaintiffs cite no cases in which a court accepted a municipal liability theory when the violation of the plaintiff's rights was so dissimilar from the past violations. No reasonable jury could find that that the past uses of hidden cameras gave notice to the district of the violations against plaintiffs.

The evidence of causation is even weaker. Plaintiffs don't identify any connection between the district's alleged practice and Kruchten's conduct. Specifically, plaintiffs don't allege that the district approved Kruchten's use of cameras to record students, that Kruchten was acting pursuant to what he believed was district policy, or even that Kruchten knew that other employees had used hidden cameras on school premises. Rather, as already discussed, Kruchten knew that he was not supposed to be using hidden cameras and that the district would not approve, which is why he told no one about what he was doing. So plaintiffs have not adduced evidence that there is a direct causal connection between what Kruchten did and the alleged district practice that plaintiffs are challenging.

**Obvious risk.** Plaintiffs argue in the alternative that the district had notice of the risk that staff would secretly record students even if the absence of past similar violations. The standard for imposing liability without past violations is "demanding," and the circumstances

52

that qualify are "narrow" and "rare." *Giese v. City of Kankakee*, 71 F.4th 582, 589–90 (7th Cir. 2023). The plaintiff must show that the constitutional violation that occurred was a "blatantly obvious" consequence of the failure to train. *Id.*

This standard necessarily incorporates two types of obviousness. The first relates to the likelihood that municipal employees will engage in the unconstitutional conduct at issue, and the second relates to the likelihood that that different training could prevent the violation. *See City of Canton*, 489 U.S. at 389–90. As a hypothetical example, the Supreme Court has pointed to a city's failure to give a police officer any training on the use of deadly force. *Id.* at 390 n.10. Because officers are usually armed, and it is almost certain that they will have to detain a fleeing suspect at some point, it would be obvious that training is needed to prevent unconstitutionally excessive force. *Id.*

Not surprisingly, claims based on this theory have a low batting average in the courts. For example, in *Connick*, the Court held that constitutional violations are not an obvious consequence of failing to train prosecutors about their obligations under *Brady* because prosecutors receive training from other sources (law school, continuing legal education, and co-counsel), and they have other incentives for staying informed, including ethical rules. 563 U.S. at 66–68. In *Taylor v. Hughes*, court held that it was not obvious that officers needed training on auditing the department's "alert" system for identifying suspects subject to arrest, even though the department had conducted no audits during the relevant time frame to ensure that the alerts were current, and the plaintiff had been arrested based on a stale alert. 26 F.4th 419, 437 (7th Cir. 2022); *id.*, at 439 (Hamilton, J., concurring in part and dissenting in part).

In *Orozco*, the court held that it was not obvious that a policy limiting prisoners to three books would lead to destruction of property without officer training. 64 F.4th at 825–26.[14]

The Supreme Court has not yet held that any particular constitutional violation was an obvious consequence of a failure to train. *J.K.J.*, 960 F.3d at 380–81. The few cases in which the court of appeals has upheld a claim under that theory generally involved relatively complicated tasks that an employee needed to perform but would not know how without training. *See, e.g.*, *Glisson v. Indiana Department of Corrections*, 849 F.3d 372, 382 (7th Cir. 2017) (coordinating cancer treatment); *Woodward*, 368 F.3d at 924 (suicide prevention). These cases are consistent with the observation in *City of Canton* that officers have an obvious need for training on the use of deadly force.

Kruchten's conduct does not follow this pattern. Any reasonable adult—public employee or otherwise—would know without training that it is an extreme invasion of privacy to secretly record a child in the bathroom. *See Jones v. City of Chicago*, 787 F.2d 200, 206–07 (7th Cir. 1986) (no municipal liability for failing to train doctors on offering a chaperone to patients during exams because "a physician knows (and the City properly may expect) that his conduct must not exceed the bounds of his oath and ethical obligations"). Plaintiffs identify no reason why it would have been obvious to the district either that its employees needed

---

[14] *See also Giese,* 71 F.4th at 589–90 (not obvious that a fire fighter would use violence on a coworker despite the fact that he "had a bad temper, a drinking problem, . . . poor judgment . . . sometimes acted aggressively when drunk at non-work, social events and . . . he occasionally yelled or became angry at work"); *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 531 (7th Cir. 2022) (not obvious that enforcement of rule requiring businesses to post a "Masks Required" sign would lead to First Amendment violations); *Bohanon v. City of Indianapolis*, 46 F.4th 669, 677 (7th Cir. 2022) (not obvious that policy allowing off-duty officers to use force in emergency situations even while drinking alcohol would lead to excessive force).

training about not using secret cameras in hotel rooms or more generally that there was a significant risk that such recording would occur. As for the need for training, Kruchten admitted that he knew he was not supposed to be recording the students, so the problem was not a failure to train. As for whether Kruchten's conduct was predictable, plaintiffs point to no other examples either within the school district or without of a teacher using hidden cameras to spy on students.

In arguing that the need to train was obvious, plaintiffs rely heavily on *J.K.J*, 960 F.3d 367. In that case, the plaintiffs were female prisoners who had been sexually assaulted numerous times by a correctional officer, and the court of appeals affirmed a judgment against the county on a failure-to-train theory. At a high level, *J.K.J.* bears some similarities to this case. As in this case, the county had a policy prohibiting the misconduct at issue, but it did little to train employees on that policy. Also as in this case, the municipal employees would have known that the misconduct at issue was wrong even without training.

But there are important differences between *J.K.J.* and this case that point to a different result. First, a key part of the court's reasoning was that the risk of sexual assault in prison is obvious, especially for female prisoners. The court observed that a correctional facility is "a tinderbox for sexual abuse," as demonstrated by the Prison Rape Elimination Act, which "owes its very existence to that reality." *Id.* at 381–82, 384. In this case, plaintiffs do not point to an endemic problem of schoolteachers secretly recording their students. In fact, plaintiffs identify no other examples of that happening, either within the school district or anywhere else. This significant difference alone makes *J.K.J.* readily distinguishable from this case.

Second, the court in *J.K.J.* relied not just on the general obviousness of the risk of sexual assault but also on past instances of sexual assault and harassment that the county had

disregarded or minimized. *Id.* at 382–83. Even a high-level policymaker admitted to knowing about sexual misconduct and doing little to stop it. *Id*. In fact, he admitted that he also participated in what the court said could be viewed as verbal harassment toward female inmates. *Id.* So, the court of appeals concluded, a reasonable jury could find that the past instances of sexual misconduct, combined with the jail's tolerance of that misconduct, made it "highly predictable, if not certain, that a male guard would sexually assault a female inmate if the County did not act." *Id.* (internal quotation marks omitted).

Plaintiffs try to make a similar argument when pointing to past uses of hidden cameras on school premises, contending that it created a "culture of reckless disregard" of students' constitutional rights. Dkt. 241, at 96; *see also id.* at 5. But as already discussed, the past uses of hidden cameras were too dissimilar to provide notice to the district of what Kruchten would do. And unlike in *J.K.J.*, plaintiffs point to no evidence of a "culture" within the district that may have influenced Kruchten. Specifically, they do not cite evidence that Kruchten or any other teacher was even aware of those other uses of hidden cameras or that Kruchten otherwise acted out of a belief that the district had a tolerant attitude toward invading students' privacy.

Third, the obvious failure of the county in *J.K.J* went well beyond a failure to train employees on the evils of sexual misconduct. The court emphasized that the county provided no mechanism for *detecting* sexual abuse because the jail did not offer inmates a way to complain confidentially, and it did not train either officers or inmates on recognizing abuse or signs of abuse. *Id.* at 375, 385. A concurring opinion also emphasized this point. *Id.* at 386 (Hamilton, J., concurring) (describing claim as based on the county's "failure to provide effective channels for complaints so as to discourage such abuse"). A later case identified "the lack of a confidential system for reporting sexual abuse in prison" as the key problem in *J.K.J. See*

*Bohanon*, 46 F.4th at 677. This makes sense because the victim and third parties are the ones most likely to report abuse; if they do not have the tools to do so, the abuse is much more likely to continue.

In this case, plaintiffs have not shown that the solution to detecting the misconduct should have been "blatantly obvious" to the district. In large part, this is because none of the victims even knew that they were victims until after the secret recordings stopped. The problem was not encouraging victims to speak up—that happened immediately once the students found the cameras—the problem was that there were no signs of abuse to detect.

Plaintiffs identify one type of training that the district could have adopted to prevent what Kruchten did. Specifically, plaintiffs say that "Kruchten would likely have curtailed his own practices" if "he had received training in what a detrimental practice hidden camera supervision was." Dkt. 241, at 46, 63–64. Plaintiffs base that argument on testimony from Kruchten that he cared about his students, and he did not realize how much harm he was causing them. Dkt. 261, ¶ 645. Plaintiffs do not cite testimony that Kruchten would have been deterred if he received empathy training, but even if the court assumes that he would have been, that is not enough. An allegation "that an injury or accident could have been avoided if an officer had had better or more training . . . could be made about almost any encounter resulting in injury." *City of Canton*, 489 U.S. at 390–91. Rather, the need for that specific type of training must be obvious. *Id.* Plaintiffs do not explain how it would have been obvious to the district not only that teachers would secretly record their students but also that teachers could be persuaded to refrain from such misconduct though training on the emotional distress such recording could cause.

Plaintiffs also contend more generally in their briefs that the district could have prevented Kruchten's conduct through better policies and procedures for chaperones:

> Kruchten would have been less likely to give in to his opportunistic type of abuse if [the district] had reasonable checks and balances in place. Supervision and auditing by administration, and a well-trained responsible co-chaperone, all of which would have inexpensive to put in place, would either entirely eliminate the opportunity, or at minimum, create an environment and culture where Kruchten could see that he was much more likely to be caught, in which case he would have been much more likely to curtail his own misbehavior.

Dkt. 241, at 64-65. Plaintiffs do not identify in their briefs any specific policies or procedures that they believe the district should have adopted. In their proposed findings of fact, plaintiffs cite the declaration of their expert for the proposition that the district could have required chaperones to always acts in pairs and prohibited chaperones from retaining copies of students' room keys. Dkt. 261, ¶ 143.[15]

Plaintiffs' suggestions are reasonable ones, and the school district should consider adopting them, if it has not already done so.  But again, the existence of better alternatives is not enough. *See City of Canton*, 489 U.S. at 390–91. Plaintiffs do not explain why it should have been obvious to the district that their proposed improvements were needed to avoid constitutional violations.

The court will grant summary judgment to the district on plaintiffs' claim that the district failed to properly train its staff on proper supervision.

---

[15] The district objects to the declaration on the ground that it is an untimely supplement of the expert's report. Dkt. 261, ¶ 143. The court need not resolve that objection because the proposed finding of fact makes no difference to the outcome of the case.

### b.  Failure to train: preventing and detecting sexual abuse

Plaintiffs also contend that the district lacked policies, procedures, and training to prevent sexual abuse and grooming, and that, if the district had taken those preventive measures, Kruchten would not have had the opportunity to violate plaintiffs' rights. The district did have policies that both prohibited sexual harassment of students and required staff to report information that "leads [the] employee to believe that a student's safety is endangered by a person enticing [a] child for immoral/illegal purposes." Dkt. 257, ¶¶ 34, 38. But the district points to little evidence that it provided training of any kind to either staff or students on preventing and detecting sexual misconduct, and it had few procedures in place for preventing such misconduct. *See* Dkt. 261, ¶¶ 13–15, 24–25, 48, 51–61.[16]

As with the lack of training on proper supervision, inaction is not enough by itself to impose liability on the district. Plaintiffs must also show notice and causation. *Estate of Wallmow*, 99 F.4th at 393–94.

Plaintiffs' brief includes fleeting references to past sexual misconduct by district staff, but plaintiffs do not allege that any of that past conduct involved secretly recording students, and plaintiffs do not explain why that past conduct would have provided notice to the district of what Kruchten did. In any event, plaintiffs disavow an argument based on a widespread practice of sexual misconduct within the district. Dkt. 261, at 50 ("Plaintiffs are not challenging a custom of ESM [educator sexual misconduct]."). So the court will not discuss those allegations or consider the numerous proposed findings of fact that plaintiffs devoted to that

---

[16] The district proposes several findings of fact about various trainings it conducted, but it provides no details about the content or frequency of that training, and it does not say whether Kruchten or the other individual defendants received that training, so those proposed facts are not useful. *See* Dkt. 257, ¶¶ 33, 52–53.

topic. *See* Dkt. 261, ¶¶ 85–172. Plaintiffs' contention is that sexual abuse was the obvious consequence of the district's lack of oversight. Plaintiffs compare the dynamic between chaperones and students to the one between guards and prisoners discussed in *J.K.J.* because the students "depended on one male chaperone for nearly everything on the field trip." Dkt. 241, at 61.

Plaintiffs also say that Kruchten had been grooming students for years, citing the evidence about the late-night, highly personal conversations that he had with students in their hotel rooms. Plaintiffs do not allege that anyone reported this conduct to the district or that district officials otherwise knew about it. Instead, plaintiffs say that this conduct is relevant to proving causation: if the district had rules that prohibited chaperones from being alone with students and had trained students to report that behavior, Kruchten would have been removed from his duties as a chaperone, and he would not have been able to record the students.

The district offers little excuse for failing to provide more guidance to both chaperones and students on appropriate boundaries, and it does not dispute that Kruchten should not have been alone with students, at night, in their hotel rooms, discussing their romantic relationships and other personal matters. That would have been an obvious red flag that Kruchten was developing inappropriate relationships with students or even grooming them for sexual abuse.

For the purpose of the district's motion for summary judgment, the court will assume that the logic of *J.K.J.* applies to teachers and students and that it is plainly obvious that staff and students need training on preventing and detecting sexual abuse. But that assumption does not help plaintiffs for a simple reason: Kruchten did not sexually assault any of the students or otherwise have sexual contact with them, and training and procedures designed to prevent or identify sexual harassment or grooming by chaperones would do little to stop a chaperone from

secretly recording students. Kruchten did not need to groom the students to put hidden cameras in their hotel bathrooms, and plaintiffs cite no evidence that the inappropriate intimacy is what led to the secret recordings.

Plaintiffs may be correct that the injuries to plaintiffs could have been prevented if someone had reported Kruchten's late-night conversations with students because that could have led to his removal as a chaperone. But as already discussed, that type of "but for" causation is not enough to establish municipal liability. *Brown*, 520 U.S. at 410. Rather, there must be a close connection between the failure to train and the injury to the plaintiff. *City of Canton*, 489 U.S. at 391. The training and policies on detecting and preventing sexual abuse that plaintiffs identify are not targeted at preventing hidden cameras. Any causal connection between those proposals and preventing what Kruchten did would have been fortuitous.

Plaintiffs say the district can be held liable for violating plaintiffs' Fourth Amendment right to privacy even if the notice to the district was based only on a potential violation of their right to be free from sexual assault under the Due Process Clause. But the authority they cite does not support that contention.

In *Thomas v. Cook County Sheriff's Department*, the plaintiff's son had died in jail from meningitis. 604 F.3d 293 (7th Cir. 2010). The plaintiff asserted claims against both jail staff and the county, contending that both had violated her son's constitutional rights by failing to provide adequate medical care. The jury found for the jail staff but against the county. The county contended on appeal that that it could not be held liable if none of its staff were liable. The court of appeals rejected that argument, reasoning that "the jury could have found that the [jail staff] were not deliberately indifferent to [the detainee's] medical needs, but simply could not respond adequately because of the well-documented breakdowns in the County's

policies for retrieving medical request forms." *Id.* at 305. In *Medina as next friend for N.M. v. Izquierdo*, the plaintiff was the mother of a child who was abused by school staff. 594 F. Supp. 3d 1045, 1059–60 (N.D. Ill. 2022). The plaintiff contended that the school administrators could be held liable for failing to intervene to stop the abuse. The court concluded that the plaintiff had stated a constitutional claim against the administrators by alleging that the abuse was widespread and that the administrators refused to investigate even when the plaintiff complained.

*Thomas* and *Medina* have nothing to do with the proposition for which plaintiffs cite those cases. Specifically, neither case holds or implies that defendants can be held liable on a constitutional claim because they knew of a risk about one type of constitutional harm but failed to prevent harm caused by a *different* risk of which they were not aware. Again, it is well established that the defendant must be aware of the same type of risk that led to the plaintiff's harm. *See Connick*, 563 U.S. at 56–57; *Brown*, 520 U.S. at 412; *City of Canton*, 489 U.S. at 391.

The bottom line is that plaintiffs have not shown that it would have been obvious to the district that deficiencies in its training or policies about preventing and detecting sexual abuse would lead chaperones to secretly record students in hotel bathrooms. That is what the standard for proving municipal liability requires, so the district is entitled to summary judgment.

CONCLUSION

To sum up, the court is resolving all claims but one as a matter of law. Specifically, the court is granting summary judgment to plaintiffs on their Fourth Amendment claim against Kruchten but granting summary judgment to the other defendants on the claims under the

Fourth Amendment and to all defendants on the claims under the Due Process and the Equal Protection clauses. The court is also granting summary judgment to the district on the issue whether Kruchten acted within the scope of his employment.

Two issues remain. First, plaintiff and Kruchten are directed to show cause why the court should not grant summary judgment to plaintiffs on the invasion-of-privacy claim under state law. Second, regardless of whether liability on the state-law claim is resolved as a matter of law, the Fourth Amendment claim and the state-law claim will proceed to trial on the issue of damages.

ORDER

IT IS ORDERED that:

1. Plaintiffs' motions for sanctions, Dkt. 298, and defendants' motion to strike plaintiffs' motion for sanctions, Dkt. 303, are DENIED.

2. Plaintiffs' motion for partial summary judgment, Dkt. 146, is GRANTED in part and DENIED in part. The court grants summary judgment to plaintiffs as to liability on their Fourth Amendment claim against David Kruchten. Plaintiffs' motion is otherwise denied.

3. Defendants' motion for summary judgment, Dkt. 156, is GRANTED in part and DENIED in part. The motion is denied on the issue whether Kruchten acted under color of law. The motion is otherwise granted. All claims against defendants Madison Metropolitan School District, Heidi Tepp, and Joe Balles are DISMISSED with prejudice, and those defendants are dismissed from the case.

4. Plaintiffs' motion to exclude evidence, Dkt. 138, is DENIED as moot.

5. Plaintiffs' motion to allow Lillian Xistris to testify at trial by video conference, Dkt. 278, is GRANTED as unopposed.

6. The parties may have until July 3, 2024, to show cause why the court should not grant summary judgment to plaintiffs on the issue whether Kruchten violated their

rights under Wis. Stat. § 995.50. If no party responds by then, the court will grant summary judgment to plaintiffs.

Entered June 25, 2024.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge